**UNITED STATES DISTRICT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| W. A.  SOKOLOWSKI, Derivatively on Behalf of Nominal Defendant MOODY'S CORPORATION, )<br><br>Plaintiff, )<br><br>v. )<br><br>CORNELIUS ALEXANDER MCGILLICUDDY III , RAYMOND W. MCDANIEL JR., BASIL L. ANDERSON, ROBERT R. GLAUBER, EWALD KIST, , HENRY A. MCKINNELL JR., NANCY S. NEWCOMB, JOHN K. WULFF, JEANNE M. DERING, JOSEPH MCCABE, MICHAEL KANEF, LINDA S. HUBER, , BRIAN CLARKSON and NOEL KIRNON, )<br><br>Defendants, )<br><br>and )<br><br>MOODY'S CORPORATION, )<br><br>Nominal Defendant. ) | Case No. 09 Civ 6063 (PKC)<br><br><br><br><br><br><br><br><br><br><br><br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff, W. A.  Sokolowski, by his undersigned counsel, on personal knowledge as to his own actions, and on information and belief, based upon investigation by counsel, as to all other matters, alleges as and for his verified derivative Complaint, as follows:

## THE NATURE OF THE CASE

1.      Plaintiff, a shareholder of Moody's Corporation ("Moody's" or "the Company"), brings this derivative action on behalf of the Company and its shareholders against certain current and former officers and directors of Moody's to remedy, *inter alia,* the massive mismanagement of the Company, breaches of fiduciary duty including the duties of loyalty and care, deliberate concealment of such wrongful conduct, fraudulent misrepresentations, causing the Company to repurchase billions of dollars in Company stock at artificially inflated prices, and illegal insider sales of Company stock, during the period from July 2004 through at least the present day ("Relevant Period").

2.      According to an April 27, 2008 article in *The New York Times*, Moody's—together with its two principal competitors, S&P and Fitch—is "a central culprit in the mortgage bust, in which the total loss has been projected at $250 billion and possibly much more." Moody's is a Nationally-Recognized Statistical Rating Organization ("NRSRO").   Its principal business is to evaluate and publish opinions on the creditworthiness of debt instruments and issuers.  Moody's, with an approximate 40% market share, is one of the three companies that dominate the market for credit ratings, the other two being S&P (also with an approximate 40% market share) and Fitch.  In a reckless quest for market share in a market where issuers select and pay for the most favorable rating, Moody's issued inflated credit ratings for billions of dollars worth of mortgage backed securities, CDO's and related instruments.

3.      During the period from late 2004 to mid 2007, Moody's continued to issue such ratings despite the knowledge possessed or which should have been possessed by the individual defendants that the Company's ratings methodology was outdated, and that market conditions

indicated extreme risk.  According to *The New York Times*, in a report published in May 2006,

Mark Zandi, Moody's Chief Economist,

> noted that consumer borrowing had soared, household debt was at a record and a fifth of such debt was classified as subprime. At the same time, loan officers were loosening underwriting standards and easing rates to offer still more loans. Zandi fretted about the "razor-thin" level of homeowners' equity, the avalanche of teaser mortgages and the $750 billion of mortgages he judged to be at risk. Zandi concluded, *"The environment feels increasingly ripe for some type of financial event."*

(*The New York Times*, April 27, 2008) (emphasis added).

4.     In January 2007, Moody's published a special report highlighting rising defaults

on 2006 vintage subprime mortgages.  Yet senior management of Moody's continued, until April

2007, to rely on the Company's standard credit rating model, based on historical default rates

and assumptions that housing prices would continue to rise.   Moody's then announced that it

was "revising the model it used to evaluate subprime mortgages," which had been introduced in

2002, because "[s]ince then, the mortgage market has evolved considerably." As *The New York*

*Times* adroitly commented, "This was a rather stunning admission; [Moody's] model had been

based on a world that no longer existed." (*The New York Times,* April 27, 2008).  It had,

however, served Moody's management's drive for structured finance market share: by 2006,

Moody's had pulled alongside its largest competitor, S&P; Moody's credit ratings market share

reached 40%, compared to S&P's 41 to 42%.  (See *Forbes.Com*, August 14, 2007, "Credit Crisis

Hurts Rating Agencies;" *Bloomberg News*, September 27, 2008, "Moody's, S&P eased rules for

more profits").

5.     After Moody's belatedly changed its ratings assumptions and, beginning in July

2007, downgraded mortgage-related securities it had previously rated as "triple A;" i.e. safe,

these securities plummeted in value, forcing investors to take massive writedowns on them, and

triggering the chain reaction that continues even now to spread, affecting not only the United States financial markets but markets throughout the world. *The New York Times* article explained: "Last year, Moody's had to downgrade more than 5,000 mortgage securities—a tacit acknowledgment that the mortgage bubble was abetted by its overly generous ratings." Unjustifiably relaxing its standards to gain market share, Moody's had delivered thousands of credit ratings on mortgage-backed bonds and structured investment pools that purchase them—CDOs—ratings that were expected to be relied upon, and were relied upon, by investors in the rated securities, including banks, pension funds, mutual funds, hedge funds and other investors.

6.    Internal Company documents show that Moody's management was fully aware that the integrity and reliability of its ratings, particularly in the structured finance market, were being systematically undermined by reckless "race to the bottom" competition. Nevertheless, in an elaborate effort to maintain the illusion of reliability and integrity upon which the value of Moody's ratings was based, management continued to tout the independence and objectivity of the Company's ratings processes. They did so knowingly and deliberately, all the while continuing to pursue short term, artificially-generated, financial results, and corresponding personal enrichment, by systematically degrading the integrity and rigor of Moody's structured finance ratings to gain and maintain market share. This course of action, together with the intentional or reckless indifference of the Company's Board of Director s("the Board"), has not only harmed the market participants who relied on Moody's structured finance ratings, but has caused massive losses to the Company and its shareholders. Moreover, throughout the period of 2006 through late 2008, Defendants caused the Company to leverage its balance sheet in order to expend $3.3 billion to repurchase Company stock at prices artificially inflated by their false

public assurances of the integrity and rigor of the Company's ratings process, while reaping

millions of dollars from sales of their personal holdings of Moody's stock.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to

Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331, because this is a civil

action arising under the laws of the United States, and principles of supplemental jurisdiction in

accordance with 28 U.S.C. § 1367.

8.      Venue is proper in this District pursuant to 28 U.S.C. §§1391 and 1401 because a

substantial part of the events or omissions giving rise to the claims alleged occurred in this

District.

## THE PARTIES

9.      Plaintiff William Sokolowski is, and was at all times relevant hereto, an owner and

holder of Moody's common stock.

10.     Nominal defendant Moody's is a Delaware corporation with its principal place of

business located at 7 World Trade Center, 250 Greenwich Street, New York, NY 10007.  The

Company, through its subsidiaries, provides credit ratings, research, and analysis covering fixed-

income securities, other debt instruments and the entities that issue such instruments in the global

capital markets.

### Director Defendants

11.     Defendant Raymond W. McDaniel Jr. ("McDaniel") has been the Chairman and

CEO of Moody's since April 2005.  He has held various positions at the Company since 1987,

and has been a director since 2003.  McDaniel received $7,376,555 in compensation from

Moody's in 2007.   Since April 1, 2006, McDaniel has sold 136,444 shares of Moody's stock for $8,795,300.

12.     Defendant Basil L. Anderson ("Anderson") has been a director of Moody's since April 2004.  He is a member of the Audit Committee and a member of the Governance and Compensation Committee.  Anderson received $184,307 in compensation from Moody's in 2007.  Anderson also sits on the boards of at least four other companies, Staples, Inc., Becton Dickinson, CRA International Inc., and Hasbro, Inc.   Moody's rates billions of dollars' worth of securities issued by companies on whose boards of directors Anderson sits, including Staples and Hasbro.

13.     Defendant Robert R. Glauber ("Glauber") has been a director of Moody's since June 1998.  He is a member of the Audit Committee and a member of the Governance and Compensation Committee.  Glauber received $179,305 in compensation from Moody's in 2007. Glauber also currently serves as a director of several entities that are rated by, or have issued securities rated by, Moody's, including Freddie Mac and XL Capital, Ltd.  Since April 1, 2006 Glauber has sold 34,000 shares of Moody's stock for $2,256,000.

14.     Defendant Ewald Kist ("Kist") has been a director of Moody's since July 2004. He is a member of the Audit Committee and a member of the Governance and Compensation Committee.  Kist received $198,055 in compensation from Moody's in 2007.  Kist sits on the boards of at least four other companies, The DSM Corporation, Royal Philips Electronics, the Dutch National Bank, and Stage Entertainment.  At least two of these other companies--Royal Philips and Stage Entertainment--are rated by, or have issued securities rated by, Moody's.

15.     Defendant Cornelius Alexander McGillicuddy III ("McGillicuddy") has been a director of Moody's since December 2001. He is a member of the Audit Committee and a

member of the Governance and Compensation Committee.  McGillicuddy received $179,305 in compensation from Moody's in 2007.  In addition to his Moody's directorship, McGillicuddy sits on the boards of Darden Restaurants, EXACT Sciences Corporation, Genzyme Corporation, Spirit Aerosystems, and Mutual of America Life Insurance Company—which have collectively issued billions of dollars of securities rated by Moody's.  Since April 1, 2006, McGillicuddy has sold 6,450 shares of Moody's stock for $419,000.

16.     Defendant Henry A. McKinnell Jr. ("McKinnell") has been a director of Moody's since October 1997.  He is Chair of the Governance and Compensation Committee and a member of the Audit Committee.  McKinnell received $199,305 in compensation from Moody's in 2007.

17.     Defendant Nancy S. Newcomb ("Newcomb") has been a director of Moody's since February 2005. She is a member of the Audit Committee and a member of the Governance and Compensation Committee.  Newcomb received $174,025 in compensation from Moody's in 2007.  Newcomb sits on the boards of at least two other companies, DIRECTV Group, Inc. and SYSCO Corporation. Moody's rates tens of billions of dollars' worth of securities issued by companies on whose boards of directors Newcomb sits, including DIRECTV and SYSCO.

18.     Defendant John K. Wulff ("Wulff") has been a director of Moody's since April 2004. He is Chair of the Audit Committee and a member of the Governance and Compensation Committee.  Wulff received $204,307 in compensation from Moody's in 2007.  Wulff also sits on the boards of at least four other companies, Hercules Incorporated, Celanese Corporation, Fannie Mae, and Sunoco, Inc.  Moody's rates hundreds of billions of dollars' worth of securities issued by these companies.

19.     The defendants named in paragraphs 11 to 18 immediately above are referred to collectively herein as "Director Defendants."

**Officer Defendants**

20.     Defendant McDaniel, listed above as a Director Defendant, is also sued in his capacity as an officer of Moody's, in view of his position and function as Chief Executive Officer of the Company.   As an officer of the Company, McDaniel is fully accountable to the Company not only for breaches of the duty of loyalty (including the duty of good faith), but also for the consequences of breaches of his duty of care in the management of the Company's business.

21.     Defendant Brian M. Clarkson ("Clarkson") is the former President and Chief Operating Officer of Moody's Investors Service.  He resigned on May 7, 2008.  During the Relevant Period while employed by Moody's, Clarkson headed the Company's structured finance ratings groups and possessed overall responsibility for leading the Company's ratings and research business.  Clarkson received $3,243,393 in compensation form Moody's in 2007.  Since April 1, 2006, Clarkson has sold 3,643 shares of Moody's stock for $135,520.

22.     Defendant Jeanne M. Dering ("Dering") is the former Executive Vice President – Global Regulatory Affairs and Compliance of Moody's.  Dering received $2,961,370 in compensation from Moody's in 2007.  Since April 1, 2006, Dering has sold 3,373 shares of Moody's stock for $225,000.  Dering resigned from her position as of November 14, 2007.  Upon Dering's resignation, the Defendant Directors waived provisions of Moody's Supplemental Executive Benefit Plan that should have required that her benefits be reduced by 60% because she resigned before age 55 and before accumulating ten years of service.  The Defendant Directors also adopted provisions treating Dering's resignation as if it were a

retirement under the Company's equity compensation plans, resulting in immediate vesting and cessation of restrictions on prior years' restricted stock grants, as well as continued vesting of stock options.

23.     Defendant Noel Kirnon ("Kirnon") is the former Executive Vice President of Moody's and head of its global Structured Finance business.  Kirnon was terminated in July 2008 as a result of his responsibility for the cover up of inaccurately high ratings granted to constant proportion debt obligations, as alleged in detail herein.

24.     Defendant Michael Kanef ("Kanef") is the current Chief Regulatory and Compliance Officer of Moody's.  He was elevated to this position after the sudden resignation of defendant Dering in November 2007.  Previously, and during a substantial part of the time frame during which, as alleged herein, Moody's management systematically degraded the quality of the Company's mortgage-related structured finance ratings, he was the Group Managing Director of the Moody's U.S. Asset Finance Group, responsible for ratings of residential mortgage-backed securities.  Kanef presided over the compliance function at Moody's during the cover up of inaccurately high ratings granted to constant proportion debt obligations, as alleged in detail herein.

25.     Defendant Linda S. Huber ("Huber") is the Executive Vice President and Chief Financial Officer of Moody's. She has executive responsibility for the Company's global finance activities, including accounting and financial reporting, tax, treasury, business planning, investor relations and internal audit. Huber received $2,749,988 in compensation from Moody's in 2007. Since April 1, 2006, Huber has sold 7,208 shares of Moody's stock for $365,043.

26.     Defendant Joseph J. McCabe ("McCabe") is the Senior Vice President and Corporate Controller of Moody's. He is responsible for Moody's worldwide accounting and

financial reporting activities, including accounting, tax, policies and procedures, internal

financial controls, SEC reporting, and compliance with the financial reporting control

requirements of the Sarbanes-Oxley Act. Since April 1, 2006, McCabe has sold 1,989 shares of

Moody's stock for $101,878.

## FACTUAL BACKGROUND

### The Fundamental Importance of Independence and Objectivity

27.     Investors rely on Moody's and its competitor rating agencies to evaluate and rate

debt securities and instruments traded in the global capital markets.  Founded in 1909 to publish

ratings of railroad securities, Moody's is the oldest of the rating agencies.  In 1913, John Moody,

the Company's founder, expanded his base of analyzed companies, launching his evaluation of

industrial companies and utilities. In 1914, Moody began expanding rating coverage to bonds

issued by cities and other municipalities in the United States. By 1924, Moody's ratings covered

nearly 100 percent of the United States bond market. In the 1970s, Moody's ratings were further

extended to the commercial paper market and to bank deposits.

28.     Moody's dominant market position permitted it to remain largely immune from

pressure from issuers of debt:

> As debt markets grew, investors became more discriminating. Most bond
> investors required two ratings, in fact. Moody's provided one and Standard &
> Poor's, a more recent arrival on the scene, the other. It was a happy duopoly – and
> the lack of competitive pressure meant independence for the agencies. On the
> other side of the deal table, however, it led to frustration. Companies complained
> that agencies were aloof, opaque, secretive – the svengalis of debt. Analysts
> didn't answer their phones. And when they did, the bond issuers complained, they
> weren't helpful. By the 1990s, Moody's was known for its bookish, academic
> atmosphere, which grated on many bankers, according to an industry survey.

FT.com, "How Moody's Faltered" (Oct. 17, 2008). Although issuers found Moody's aloofness frustrating, the Company's independence from issuer pressures fostered the objective credit analysis relied upon by investors.

29. The effective duopoly enjoyed by Moody's and S&P permitted them to maintain objectivity even as their business models shifted to an "Issuer Pays" paradigm. Originally, Moody's collected revenue from investors who relied upon its ratings. In the 1970s, the major rating agencies including Moody's began the practice of charging issuers as well as investors for rating services. This mixed revenue model has evolved over time at Moody's to one in which issuer payments are the primary source of revenue. For example, in 2006, Moody's reported that the Company "derived 87% of [its 2005] revenue from Issuer payments for Credit Ratings, and virtually all of the remainder from sales of credit research and data products." [Moody's 2006 Code Implementation Report].

30. The "Issuer Pays" model, however, magnified the importance, to investors relying on Moody's ratings (as well as to investors in Moody's itself), of the presence of objective policies, practices and procedures to ensure the integrity of the rating process. That is because the "Issuer Pays" model creates an inherent conflict of interest because the institutions paying for a credit rating benefit from a positive report. Moody's itself admits that this business model entails potential conflicts of interest that could impact the independence and objectivity of the rating process. And, as Fitch—the third major credit rating agency, began to make inroads on the market's duopolistic structure in the 1990s, introducing competitive pressures to the "Issuer Pays" credit rating system, the reputation of the rating agency for integrity, objectivity, and independence became an even more important fundamental consideration.

31.    Moody's and its competitors succeed in the market because investors rely on them to fairly and objectively evaluate credit quality.  Even today, Moody's website states: "Moody's independence and integrity have earned us the trust of capital market participants worldwide." Reputation is the foundation of that trust.

32.    Like independent auditors, credit rating agencies are "gatekeepers" that provide independent verification regarding an issuer's self-interested assertions about itself.   The value of the independent verification to investors depends entirely upon the absence of the self-serving motivation necessarily inherent in the issuer's assertion.  As Professor John Coffee explains:

> [G]atekeepers are reputational intermediaries who provide verification and certification services to investors.  These services can consist of verifying a company's financial statements (as the independent auditor does), evaluating the creditworthiness of the company (as the debt rating agency does), assessing the company's business and financial prospects vis-a-viz its rivals (as the securities analyst does), or appraising the fairness of a specific transaction (as the investment banker does in delivering a fairness opinion). . . .
>
> Characteristically, the professional gatekeeper essentially assesses or vouches for the corporate client's own statements about itself or a specific transaction. This duplication is necessary because the market recognizes that the gatekeeper has a lesser incentive to lie than does its client and thus regards the gatekeeper's assurance or evaluation as more credible. To be sure, the gatekeeper as watchdog is typically paid by the party that it is to watch, *but its relative credibility stems from the fact that it is in effect pledging a reputational capital that it has built up over many years of performing similar services for numerous clients. In theory, such reputational capital would not be sacrificed for a single client and a modest fee.*

John C. Coffee, Jr.. "Understanding Enron: It's About the Gatekeepers, Stupid," Columbia Law School, The Center for Law and Economic Studies, Working Paper No. 207(July 30, 2002) (emphasis added).

33.    Moody's management understands the fundamental importance of this "reputational capital that it has built up over many years," repeatedly emphasizing independence

and integrity in communications to shareholders.  For example, Moody's 2005 Annual Report to

Shareholders states that

> Moody's is one of the world's most respected sources of independent opinion and
> analysis about credit risk, helping set a common global standard for comparing
> debt instruments.
>
> The above statement should be familiar to Moody's long-term stakeholders and
> other regular readers of our Annual Reports.  The words bear repeating, however,
> because they speak to the fundamental ideas driving our strategy, key business
> initiatives and future direction.
>
> It is appropriate to start with the concept of "independent opinion and analysis."
> In recent years, legislative and regulatory scrutiny of financial services firms has
> focused on whether its integrity is tainted by conflicts of interest or otherwise
> compromised.  With respect to credit rating agencies, and Moody's in particular,
> the examinations have been reassuring.  Nonetheless, the growing reliance on our
> opinions and analysis highlights the importance of assuring integrity into the
> future.  Moody's must be increasingly rigorous and transparent in demonstrating
> our independence and managing potential conflicts.

34.    Defendant McDaniel himself put it well when he described trust as one of the

"raw materials" of Moody's business:

> If one considers the "raw materials" that support our business, two stand out: the
> proliferation of credit risk-sensitive instruments in the global marketplace, and the
> market's trust in and reliance upon Moody's. . . .  That leaves trust.  Moody's is
> committed to reinforcing among all relevant stakeholders—debt issuers, the investment
> community, employees, governmental authorities and shareholders—a sense of trust in
> the accuracy, independence and reliability of Moody's products and services, and our
> stewardship of the business. . .Our operating, financial and regulatory strategies must, in
> essence, be strategies of trust.               *****

**OUR COMMITMENTS TO CUSTOMERS, SHAREHOLDERS AND
OTHER STAKEHOLDERS**

> My earlier comments about preserving trust while pursuing innovation address
> basic building blocks for meeting the expectations of Moody's stakeholders
> worldwide.  In doing so, our goal is to remain the leading authority on credit risk
> in the global capital markets.  In so far as we meet those expectations, Moody's
> stands very well positioned to continue to reward the faith—the trust—that our
> shareholders have placed in us.

In closing, and in reflecting on my first year as Moody's Chief Executive Officer, I can do no better than to repeat the commitment in our shareholder letter of last year: most importantly, we remain committed to upholding the independence and integrity of our business.  We will preserve what Moody's has built over the last hundred years and we will prepare for what must be built in the years to come for Moody's to continue its track record of professional and financial success.

Raymond W. McDaniel, Jr.
Chairman and Chief Executive Officer
(Moody's Annual Report to Shareholders for 2005)

Thus, more than most other types of businesses, Moody's trades on its reputational capital, and the trust of investors in its objectivity, independence, and integrity.

**The Structured Finance Market**

35.      The emergence and evolution of a new type of debt market--the structured finance market--created new opportunities and pressures for the credit rating agencies.

36.      The term "structured finance" refers to asset backed securities created through the process of "securitization." Securitization involves pooling and repackaging of cash-flow-producing financial assets into securities, which are then sold to investors.  Many types of financial assets can be securitized so long as they are associated with cash flow.  Such assets include mortgages, student loans, credit card balances, auto loans, equipment leases, aircraft leases, and even tobacco litigation fee payments.  Two prevalent types of asset-backed securities are residential mortgage-backed securities ("RMBS") and commercial mortgage-backed securities ("CMBS").

37.      The term "securitization" is derived from the fact that the form of financial instruments used to obtain funds from the investors are securities.  These securities are "structured," i.e., divided, into separate "tranches" of priority, such that subordinated tranches absorb losses and thus provide credit support  to higher tranches.  If the transaction is properly structured and the pool performs as expected, the credit risk of all tranches of structured debt

improves; if improperly structured, the affected tranches will experience dramatic credit deterioration and loss.

38.     Because all cash flow producing assets can be securitized, the securitization process does not necessarily stop at this first level.  The asset-backed securities themselves can be pooled and securitized.  Thus, collections of asset-backed securities such as RMBS can themselves serve as the basis for "second order" structured finance securities.  Most prominent of such second-order structured finance securities are collateralized debt obligations (CDOs), hundreds of billions of dollars of which are issued each year.  And the CDO's, too can be pooled and securitized, into an instrument referred to as a "CDO Squared."  At each level of securitization, the investment bankers who package these securities earn lucrative fees.

39.     Furthermore, the structured finance market also includes "synthetic" CDO's. Synthetic CDOs do not own cash assets such as bonds or loans. Instead, synthetic CDOs gain credit exposure to a portfolio of fixed income assets without owning those assets through the use of credit default swaps, a derivatives instrument.  Under such a swap, the credit protection seller, the CDO, receives periodic cash payments, called premiums, in exchange for agreeing to assume the risk of loss on a specific asset in the event that asset experiences a default or other credit event.  Like a cash CDO, the risk of loss on the CDO's portfolio is divided into tranches. Losses will first affect the equity tranche, next the mezzanine tranches, and finally the senior tranche. Each tranche receives a periodic payment (the swap premium), with the junior tranches offering higher premiums.

40.     Credit ratings issued by Moody's and its competitors were crucial to the structured finance market.  Because of the highly complex structure of these securities and the volume of the asset pools upon which they were based, investors relied heavily on the credit

rating agencies to evaluate and rate the credit quality of the various tranches of asset backed

securities:

> Two main characteristics of structured finance products are the pooling of assets
> and the tranching process which is designed to create seniority ordering among
> the different tranches of securities. Senior classes of securities are designed in
> order to be immune, to a certain extent, from default losses, which are initially
> borne by riskier (equity and mezzanine) tranches. This segmentation enables the
> product to appeal to investors with different risk profiles.
>
> These characteristics however imply a high level of complexity, as the tranching
> process consists of legally organizing the distribution of cash-flows from the asset
> pool to different tranche investors. In order to adequately assess these
> instruments, an investor needs to gauge the credit risk of the underlying
> (heterogenous) collateral assets but also to have sufficient insight into the legal
> structure and the specific provisions of the transaction (eg, implication of asset
> managers) that organize the different seniority levels of the tranches.
>
> Due to this complexity and the rising interest of larger categories of investors,
> which often do not have the resources, time or expertise for a thorough analysis of
> the risk of the available securities, the market has come to heavily rely on credit
> ratings. They form the easiest source of information and a standardized evaluation
> of structured finance transactions.

THE COMMITTEE OF EUROPEAN SECURITIES REGULATORS, The role of credit rating
agencies in structured finance, CONSULTATION PAPER (February 2008).

41.    Additionally, many of the institutional investors to which the securities were

marketed were restricted by law to invest only in highly-rated, investment grade securities.

Thus, credit ratings issued by Moody's and its competitors were an essential lynchpin to the

structuring and sale of these securities.

42.    The structured finance market experienced explosive growth, both in terms of

volume and innovation, in the early years of this decade.  Relying on credit ratings from

Moody's and its competitors, investors proceeded to purchase these derivative "products" in

unprecedented numbers.   From 2002 to 2006, the volume of RMBS and CDO deals rated by the

rating agencies increased exponentially, as did the revenues the firms derived from rating these

"products." The structured finance "products" that the rating agencies were asked to evaluate also became increasingly complex, including the expanded use of credit default swaps to replicate the performance of mortgage-backed securities.  Further, as investor demand for higher yielding instruments rose, the loans to retail borrowers being securitized into RMBS, particularly subprime RMBS, became more complex and less conservative.

43.    From 2004 through 2006, Moody's structured finance ratings business generated an increasing share of its overall rating revenue and was its fastest growing revenue source.  In 2004, structured finance ratings generated $553.1 million in revenue and constituted 48.4% of all Moody's rating revenue.  In 2005, structured finance revenue grew 29.3%, to $715.4 million, accounting for 51.7% of all Moody's ratings revenue; by contrast, the rest of Moody's ratings revenue grew less than half as fast (13.4%).  In 2006, structured finance revenue grew a further 23.9% to $886.7 million, accounting for 54.2% of all Moody's rating revenue, while the rest of Moody's ratings revenue grew less than half as fast.  In 2007, strong growth in the first half of the year was offset by declines in the second half as ratings downgrades froze credit markets and eliminated demand for structured finance offerings—overall, Moody's structured finance ratings revenues grew 1%, to $890.6 million, and accounted for approximately 50% of Moody's total ratings revenue for the year.

44.    Thus, the rapidly expanding structured finance market was crucially important to Moody's short-term financial success—and, through equity based incentive compensation, paid to the Officer Defendants and their subordinates—during this time frame. (*See* ¶¶ 109-111 below).

45.    Unfortunately, several unique features of the structured finance market intensified the conflicts of interest inherent in Moody's "Issuer Pays" business model for credit ratings.

46.    First, as noted above, due to the rapid growth of the structured finance market, structured finance ratings generated the bulk of the Company's revenue and growth.

47.    Second, the fees charged by Moody's to provide structured finance ratings were approximately three times higher than the fees for rating corporate bonds of equivalent issuance size.

48.    Third, compared to other debt markets, the structured finance market was concentrated.  For example, the corporate debt market consists of all corporate issuers. By comparison, in structured finance, the number of players is relatively small, being confined to a few giant institutional lenders, such as Freddie Mac and Fannie Mae, and investment banks who arrange and structure asset backed securities, CDO's, and other structured instruments. Moreover, the structured finance players are repeat, high volume customers, arranging securities for distribution, whereas a corporate issuer will float debt only as required to meet its capital needs.  Thus, unlike the situation in which a corporate bond is rated, where the benefit to be gained from awarding an artificially favorable rating to an obligation so as to curry favor with the issuer is outweighed by the harm to Moody's reputation for objectivity that would ensue, the consequences of client displeasure in structured finance were greatly magnified, both qualitatively and quantitatively. Losing one client, for example, could result in losing 10 percent or more of market share. [this is getting a little too close to "business judgment"]

49.    Fourth, the process of issuing structured finance ratings differed in two important ways from the credit ratings process for other debt securities.  As explained in more detail below, in structured finance, (a) Moody's reviewed the proposed transaction structures and proposed structural and credit enhancement adjustments needed to achieve the desired ratings for the various tranches of an issuance, and (b) eventually the fee structure was bifurcated to permit the

18

payment of a nominal fee for a preliminary evaluation, followed by the payment of the full traditional rating fee only if the issuer selected the rating agency to publish a final rating.

50.     These unique characteristics of the structured finance market combined to make assurances of Moody's integrity, independence, and objectivity crucially important to the Company, its shareholders, and to the investors who relied upon it to provide credit ratings for structured finance investment vehicles.

## MANAGEMENT'S PUBLIC REPRESENTATIONS AND ASSURANCES

51.     Fully recognizing the crucial importance of trust, integrity, independence and objectivity to the value of Moody's ratings and its ratings business, the Officer Defendants caused Moody's to issue repeated public assurances during the Relevant Period.  As demonstrated in paragraphs 100 to 179 below, however, these public statements were false, and the Officer Defendants knew it.

## Assurances of Compliance with the IOSCO Code

52.     Such public assurances began in the wake of the Enron and Worldcom debacles of 2001.  Investors and regulators wondered why the rating agencies had not forewarned the market of the impending collapse of these companies, and questioned whether the conflict inherent in the "Issuer Pays" model was to blame.  On November 15 and 21, 2002, Defendant McDaniel, then Moody's President, submitted a written statement in connection with SEC hearings that declared:

> Objectivity and independence.  Moody's internal policies and procedures have mitigated the latent conflict of interest that is inherent in the rating agency business model.  As such, our rating opinions are the product of analysis that is unbiased and trustworthy.

53.     Despite these assurances, the regulators took action, collaborating with Moody's and the other rating agencies to develop standards for credit ratings.   In December 2004, the

International Organization of Securities Commissions ("IOSCO," of which the SEC is a member), published a model code of conduct for credit rating agencies titled The IOSCO Code of Conduct Fundamentals for Credit Rating Agencies (the "IOSCO Code").  The IOSCO Code was the outcome of "two years of collaborative effort by global regulatory authorities, the credit rating industry and credit market participants."

54.    The first section of the IOSCO Code was devoted to principles and standards of business conduct intended to enforce "The Quality and Integrity of the Rating Process."  To that end, the IOSCO Code stated that credit rating agencies:

> should adopt, implement and enforce written procedures to ensure that the opinions it disseminates are based on a thorough analysis of all information known to the CRA that is relevant to its analysis according to the CRA's published rating methodology.

55.    The second section of the IOSCO Code focused on maintaining independence from the issuers (who paid the credit rating agencies for their ratings). The IOSCO Code emphasized that such independence was "vital" to ensuring "the integrity of the rating process:"

> the essential purpose of the Code Fundamentals is to promote investor protection by safeguarding the integrity of the rating process.  IOSCO members recognize that credit ratings, despite their numerous other uses, exist primarily to help investors assess the credit risks they face when making certain kinds of investments. Maintaining the independence of CRAs vis-à-vis the issuers they rate is vital to achieving this goal.

56.    The IOSCO Code explains that credits ratings lacking in quality and integrity are essentially worthless :

> Rating analyses of low quality or produced through a process of questionable integrity are of little use to market participants.  Stale ratings that fail to reflect changes to an issuer's financial condition or prospects may mislead market participants.  Likewise, conflicts of interest or other undue factors – internal and external – that might, or even appear to, impinge upon the independence of a rating decision can seriously undermine a CRA's credibility.  Where conflicts of interest or a lack of independence is common at a CRA and hidden from investors, overall investor confidence in the transparency and integrity of a market

can be harmed.

57.     The specific relevant sections of the IOSCO Code stated as follows:

1.     QUALITY AND INTEGRITY OF THE RATING PROCESS

A.     Quality of the Rating Process

1.1     The CRA should adopt, implement and enforce written procedures to ensure that the opinions it disseminates are based on a thorough analysis of all information known to the CRA that is relevant to its analysis according to the CRA's published rating methodology.

*****

1.4  Credit ratings . . . should reflect all information known, and believed to be relevant, to the CRA, consistent with its published methodology. . .

*****

1.6  The CRA and its analysts should take steps to avoid issuing any credit analyses or reports that contain misrepresentations or are otherwise misleading as to the general creditworthiness of an issuer or obligation.

*****

2.     CRA INDEPENDENCE AND AVOIDANCE OF CONFLICTS OF INTEREST

A.     General

2.1     The CRA should not forbear or refrain from taking a rating action based on the potential effect (economic, political, or otherwise) of the action on the CRA, an issuer, an investor, or other market participant.

2.2     The CRA and its analysts should use care and professional judgment to maintain both the substance and appearance of independence and objectivity.

2.3     The determination of a credit rating should be influenced only by factors relevant to the credit assessment.

2.4     The credit rating a CRA assigns to an issuer or security should not be affected by the existence of or potential for a business relationship between the CRA (or its affiliates) and the issuer (or its affiliates) or any other party, or the non-existence of such a relationship.

*****

B.     CRA Procedures and Policies

2.6     The CRA should adopt written internal procedures and mechanisms to (1) identify, and (2) eliminate, or manage and disclose, as appropriate, any actual or potential conflicts of interest that may influence the opinions and analyses the CRA makes or the judgment and analyses of the individuals the CRA employs who have an influence on ratings decisions.  The CRA's code of conduct should also state that the CRA will disclose such conflict avoidance and management measures.

2.7     The CRA's disclosures of actual and potential conflicts of interest should be complete, timely, clear, concise, specific and prominent.

*****

58.     The Officer Defendants caused Moody's to repeatedly and falsely state that it was operating in compliance with the IOSCO Code.  For example, in a report Moody's published on April 12, 2006 on its own code of conduct, Moody's stated that "Moody's endorses the principles expressed in the IOSCO Code, and we are committed to implementing them through our own Code . . . Moody's Code is consistent with, and achieves the objectives of, the IOSCO Code."  Moody's made similar statements in, *inter alia,* Moody's Forms 10-K for 2005 and 2006, Moody's annual reports for 2005 and 2006, and in Moody's own Code of Conduct.

59.     As demonstrated in paragraphs 100 to 179 below, these public statements were false, and the Officer Defendants knew it.  In particular, the assurances of integrity, independence, objectivity, and rigorous analysis contained in such public statements were false, as demonstrated below.

**Assurances in the Moody's Code of Conduct**

60.     In June 2005, in response to the ongoing regulatory concerns with credit rating agencies, the Officer Defendants caused Moody's to publicly claim that it had adopted a "Code of Professional Conduct," reproduced in relevant part below (the "Code"). Defendants also

caused Moody's to publish this Code, which purportedly described and governed Moody's conduct of its credit rating operations.

61.    On information and belief, Defendant Dering, in her role as Executive Vice President, Regulatory Affairs and Compliance, was directly responsible for drafting and publishing the representations set forth in the Moody's Code.

62.    On information and belief, Defendant McDaniel, in his role as Chief Executive Officer, was directly responsible for approving and publishing the representations set forth in the Moody's Code.

63.    On information and belief, the Director Defendants other than McDaniels, in their roles as Directors and Audit Committee members, were directly responsible for approving and causing the publication of the representations set forth in the Moody's Code, all of which they knew or should have known were untrue.

64.    Moody's Code states, in relevant part:

In order to enhance market understanding and confidence in Moody's credit ratings, Moody's has adopted this Code of Professional Conduct (the "Moody's Code" or "Code"). Through this Code, Moody's seeks to protect the integrity of the rating process. . .

II.  What Are Credit Ratings?
                                        *****
In the rating process, Moody's maintains independence in its relationships with Issuers and other interested entities. . .Nor does Moody's act as an advisor to the Issuers it rates.  Moody's may comment on the potential credit implications of proposed structural elements of a security, but Moody's does not participate in the actual structuring of any security under consideration for a Credit Rating.

As a matter of policy, and in keeping with i5s role as an independence and objective publisher of opinions, Moody's retains complete editorial control over the content of the Credit Ratings, credit opinions, commentary, and all related publications.

III.    The Provisions

1.      Quality and Integrity of the Rating Process

As described in the IOSCO Principles, Moody's will endeavor to provide forward-looking opinions on the relative creditworthiness of issuers of debt and debt-like instruments in order to help reduce the information asymmetry that 4xists between those Issuers and potential purchasers of their debt.

A.      Quality of the Rating Process

                    *****

1.4      . . .Credit Ratings will reflect consideration of all information known, and believed to be relevant, by the applicable Moody's Analyst and rating committee, in a manner generally consistent with Moody's published methodologies.

                    *****

1.5      Moody's and its Analysts will take steps to avoid issuing any credit analyses, ratings or reports that knowingly contain misrepresentations or are otherwise misleading as to the general creditworthiness of an Issuer or obligation.

                    *****

C.      Integrity of the Rating Process

1.12     Moody's and its Employees will deal fairly and honestly with Issuers, investors, other market participants, and the public.

                    *****

l.14     Moody's and its Analysts will not, either implicitly or explicitly, give any awareness or guarantee of a particular Credit Rating prior to a rating committee. This does not preclude Moody's from developing provisional assessments used in structured financings or similar transactions.

1.15     the Office of Compliance will be responsible for assessing adherence to the various procedural provisions of this Code. . .

                    *****

2.      Independence and Management of Conflicts of Interest

A.      General

2.1      Moody's will not forbear or refrain from taking a Credit Rating action based on the potential effect (economic, political, or otherwise) of the action on Moody's, an Issuer, an investor, or other market participant.

2.2     Moody's and its Analysts will use care and professional judgment to maintain both the substance and appearance of independence and objectivity.

2.3     The determination of a Credit Rating will be influenced only by factors relevant to the credit assessment.

2.4     The Credit Rating Moody's assigns to an Issuer, debt or debt-like obligation will not be affected by the existence of, or potential for, a business relationship between Moody's (or its affiliates) and the Issuer (or its affiliates) or any other party, or the non-existence of any such relationship.

*****

B.     Procedures and Policies

2.6     Moody's will adopt written internal procedures and mechanisms to:

    2.6.1   identify; and

    2.6.2   eliminate, or manage and disclose, as appropriate, actual or potential conflicts of interest that may influence the opinions and analyses Moody's makes or the judgment and analyses of Moody's Employees who have an influence on Credit Rating decisions.

2.7     Moody's disclosures of known actual and potential conflicts of interest will be complete, timely, clear, concise, specific and prominent.  Such disclosures will be made through moodys.com.

*****

4.     Enforcement and Disclosure of the Code of Conduct and Communication with Market  Participants

4.1     Moody's Management will be responsible for the implementation and the enforcement of the Moody's Code.  The Office of Compliance will annually review and assess the efficacy of such implementation and enforcement.

4.2     The provisions of this Code are derived from the IOSCO Principles and the IOSCO Code.  However, Moody's made certain modifications to more closely correspond with Moody's business mode and practices.  Such modifications will be specifically identified and explained in a report that Moody's will publish annually outlining compliance with the Moody's Code and explaining any deviations that may exist between the Moody's Code and the IOSCO Code.

4.3     With respect to the subjective standards that are incorporated in this Code, Moody's will use its good faith efforts in implementing such standards.

65.      As demonstrated in paragraphs 100 to 179 below, these public statements were false, and the Officer Defendants knew it.  In particular, the assurances of integrity, independence, objectivity, and rigorous analysis contained in such public statements were false, as demonstrated below.

**Moody's Annual Report for 2005**

66.      On or about March 23, 2006, Moody's published and distributed to Moody's investors Moody's Annual Report to Shareholders for 2005 (the "2005 Annual Report").  The 2005 Annual Report included a letter to shareholders authored and signed by Defendant McDaniel, which stated, in relevant part:

> Dear Shareholders:
>
> *****
>
> PRESERVING TRUST AND PURSUING INNOVATION FOR CONTINUED GROWTH
>
> First, however, I wish to address these important questions briefly at a more fundamental level.
>
> If one considers the "raw materials" that support our business, two stand out: the proliferation of credit risk-sensitive instruments in the global marketplace, and the market's trust in and reliance upon Moody's.  It is not venturesome to predict that forces such as the globalization and disintermediation of financial markets, together with advances in information and financial technology, will drive continued growth in the supply and diversity of credit instruments.
>
> That leaves trust.  Moody's is committed to reinforcing among all relevant stakeholders—debt issuers, the investment community, employees, governmental authorities and shareholders—a sense of trust in the accuracy, independence and reliability of Moody's products and services, and our stewardship of the business. . .
>
> Our operating, financial and regulatory strategies must, in essence, be strategies of rust that flow from the talent of our employees and the culture of our company.  Talent in analyzing credit risk is the essential ingredient for competing in our industry, serving markets, and developing products and services that meet the ever-increasing expectations for our business.  When combined with our commitment to transparency in what we do and how we do it, talent and culture form a basis for trust in Moody's that will be deserved and durable.

Operating Strategy.  Our core operating strategy is to position Moody's to take advantage of growth in credit markets driven by globalization, disintermediation and financial technology.

- Globalization and disintermediation of financial markets introduce new borrowers and investors to each other.  Moody's independent and authoritative credit opinions, research and analytical tools serve as important catalysts for creating efficiency in this capital formation process.

- The adoption of structured finance technology in credit markets globally increases the range of financial options for debt issuers, permitting less creditworthy borrowers to issue high-quality securities.  Moody's plays an essential role in assessing the risks and protections associated with these complex transactions and communicating this information to the investment community.

*****

Regulatory Strategy. . .The principal concerns of both U.S. and international authorities are the levels of independence, transparency and compliance with regulatory expectations practiced by major rating agencies.  In June 2005, Moody's adopted its Code of Professional Conduct in response to the model international code.  We also announced our intention to report annually on our implementation of our Code of Professional Conduct for review by relevant authorities and market participants.  When combined with Moody's ongoing efforts to enhance the transparency of our rating practices through broader publication of analytical methodologies and measurements of our performance, we believe that Moody's has responded appropriately to regulatory interests and concerns.  We continue to seek mechanisms and opportunities to enhance our communications with regulators, and to satisfy authorities that the position of trust occupied by Moody's and the industry is well placed and well serves global capital markets.

OUR COMMITMENTS TO CUSTOMERS, SHAREHOLDERS AND OTHER STAKEHOLDERS

My earlier comments about preserving trust while pursuing innovation address basic building blocks for meeting the expectations of Moody's stakeholders worldwide.  IN doing so, our goal is to remain the leading authority on credit risk in the global capital markets.  In so far as we meet those expectations, Moody's stands very well positioned to continue to reward the faith—the trust—that our shareholders have placed in us.

In closing, and in reflecting on my first year as Moody's chief Executive Officer, I can do no better than to repeat the commitment in our shareholder letter of last year:  most importantly, we remain committed to upholding the independence and integrity of our business.  We will preserve what Moody's has built over the last

hundred years and we will prepare for what must be built in the years to come for Moody's to continue its track record of professional and financial success.

Raymond W. McDaniel, Jr.
Chairman and Chief Executive Officer

67.    The 2005 Annual Report included additional material, which stated, in relevant

part:

*****

Moody's is one of the world's most respected sources of independent opinion and analysis about credit risk, helping set a common global standard for comparing debt instruments.

The above statement should be familiar to Moody's long-term stakeholders and other regular readers of our Annual Reports.  The words bear repeating, however, because they speak to the fundamental ideas driving our strategy, key business initiatives and future direction.

It is appropriate to start with the concept of "independent opinion and analysis." In recent years, legislative and regulatory scrutiny of financial services firms has focused on whether investment analysis is truly independent or whether its integrity is tained by conflicts of interest or otherwise compromised.  With respect to credit rating agencies, and Moody's in particular, the examinations have been reassuring.  Nonetheless, the growing reliance on our opinions and analyses highlights the importance of assuring integrity into the future.  Moody's must be increasingly vigorous and transparent in demonstrating our independence and managing potential conflicts.  We have responded with a variety of actions, including adopting a Code of Professional Conduct for all rating agency employees (in addition to the corporation's existing Business Code of Conduct), establishing an office of Ratings Compliance, strengthening our credit policy function, and publishing more comprehensive and transparent rating methodologies so that users of our ratings can better understand the basis of our opinions.

*****

***Independence.  Performance.  Transparency.  Innovation.  Global Coverage***.  **These are the watchwords by which stakeholders judge Moody's. . . .** (Emphasis added).

*****

*Globalization and Integration of Financial Markets*

28

*****

*Disintermediation*

*****

*Increased Adoption of Structured Finance*

In the last 20 years, structured finance has grown from a relatively narrow niche to become a prominent fixture of many fixed-income markets.  It has become both a key source of financial innovation and one of the fastest-growing segments of the global capital markets.  Structured finance is Moody's largest ratings business and has been the fastest-growing over the last five years.

*****

…[D]uring 2005, Moody's enacted several significant rating compliance policies and published these for public review.  Moody's Code of Professional Conduct, modeled after a code of conduct designed by international regulatory authorities, was published in June 2005.  It seeks to enhance market understanding and confidence in our credit ratings by setting out:

•    Moody's commitment to maintain the quality and integrity of the rating process;

•    The policies and controls to ensure that we maintain our independence and properly manage potential conflicts of interest; and

•    Moody's responsibilities to investors and issuers.

Moody's Code of Professional Conduct, as well as our corporate Code of Business conduct, is available for review on Moody's website www.moodys.com.

68.    As demonstrated in paragraphs 100 to 179 below, these public statements were false, and the Officer Defendants knew it.  In particular, the assurances of integrity, independence, objectivity, and rigorous analysis contained in such public statements were false, as demonstrated below.

**Moody's Form 10-K for 2005**

69.    On March 1, 2006, Defendants caused Moody's to file with the SEC its Form 10-K for 2005 (the "2005 Form 10-K").

70.    The 2005 Form 10-K was signed by Defendants McDaniel, Huber and McCabe in their respective capacities as principal executive officer, principal financial officer, and principal accounting officer.  Their signatures reflect their knowledge and approval of, and constitute their publication of, the statements made therein.

71.    The 2005 Form 10-K was signed by Defendants Anderson, Glauber, McKinnell, Newcomb, Kist, Mack and Wulff in their capacities as directors of Moody's.  Each of these Defendants were a member of the Moody's Audit Committee, the responsibilities of which included review of the Company's reports on Form 10-K and 10-Q.  Their signatures reflect their knowledge and approval of, and constitute their publication of, the statements made in the 2005 Form 10-K.

72.    The 2005 Form 10-K stated, in relevant part:

**The Company**

Moody's Investors Service publishes rating opinions on a broad range of credit obligors and credit obligations issued in domestic and international markets, including various corporate and governmental obligations, structured finance securities and commercial paper programs.  It also publishes investor-oriented credit research, including in-depth research on major debt issuers, industry studies, special comments and credit opinion handbooks.  Moody's credit ratings and research help investors analyze the credit risks associated with fixed-income securities.  Such independent credit ratings and research also contribute to efficiencies in markets for other obligations, such as insurance policies and derivative transactions, by providing credible and independent assessments of credit risk. . .

*****

**Prospects for Growth**
…The securities being issued in the global fixed-income markets are becoming more complex.  Moody's expects that these trends will provide continued long-term demand for high-quality, independent credit opinions.

*****

The complexity of capital market instruments is also growing.  Consequently, assessing the credit risk of such instruments becomes more of a challenge for financial intermediaries and asset managers.  In the credit markets, reliable third-

party ratings and research increasingly supplement or substitute for traditional in-house research as the scale, geographic scope and complexity of financial markets grow.

Growth in issuance of structured finance securities has generally been stronger than growth in corporate and financial institutions issuance, and Moody's expects that trend to continue.  Growth in structured finance has reflected increased adoption of structured finance as an acceptable financing mechanism. . .

*****

**Regulation**

…Internationally, several regulatory developments have occurred:  IOSCO – In December 2004, the Technical Committee of the International Organization of Securities Commissions ("IOSCO") published the Code of Conduct Fundamentals for Credit Rating Agencies (the "IOSCO Code").  The IOSCO Code is the product of approximately two years of collaboration among IOSCO, rating agencies and market participants, and incorporates provisions that address three broad areas:

- The quality and integrity of the rating process;

- Credit rating agency independence and the avoidance of conflicts of interest; and

- Credit rating agency responsibilities to the investing public and issuers.

The IOSCO Code is not binding on credit rating agencies.  It relies on voluntary compliance and public disclosure of areas of non-compliance by credit rating agencies so that users of credit ratings can better assess rating agency behavior and performance.  **Moody's endorsed the IOSCO Code and in June 2005 published its Code of Professional Conduct (the "Moody's Code") pursuant to the IOSCO Code.**

(Emphasis added).

As demonstrated in paragraphs 100 to 179 below, these public statements were false, and the

Officer Defendants knew it.  In particular, the assurances of integrity, independence, objectivity,

and rigorous analysis contained in such public statements were false, as demonstrated below.

**Moody's Report on the Implementation of its Code of Conduct**

73.    On or about April 12, 2006, Defendants caused Moody's to publish and make available on its website the annual report, required by Section 4.2 of Moody's Code, on Moody's implementation of Moody's Code (the "Code Implementation Report").

74.    On information and belief, Defendant Dering, in her role as Executive Vice President, Regulatory Affairs and Compliance, was directly involved in drafting and publishing the representations set forth in the Code Implementation Report.

75.    On information and belief, Defendant McDaniel, in his role as Chief Executive Officer, was directly involved in approving and publishing the representations set forth in the Code Implementation Report.

76.    The Code Implementation Report stated, in relevant part:

**1.    Introduction and Background**

**A.    Introduction**

Moody's Investors Service ("MIS" or "Moody's") adopted the Code of Professional Conduct (the "Code" or "Moody's Code") in June 2005.  **Moody's Code sets forth the overall policies through which we seek to further our objective to protect the integrity, objectivity and transparency or our credit rating process.**  The Code reflects the guidance provided in the International Organization of Securities Commissions' ("IOSCO") Code of Conduct Fundamentals for Credit Rating Agencies (the "IOSCO Code").

*****

**Moody's endorses the principles expressed in the IOSCO Code, and we are committed to implementing them through our own Code.   Our support for the IOSCO Code stems, in large part, from our commitment to be a useful and responsible participant in the global capital markets and our belief that the IOSCO principles represent sound business practices for the rating agency industry.**

*****

## II.    Implementation of Moody's Code

**Through the implementation of the Moody's Code, we seek to protect the quality, integrity and independence of the rating process, to ensure that investors and Issuers are treated fairly. . .We believe that this will enhance market understanding of and confidence in Moody's Credit Ratings.**

*****

## A.    Quality and Integrity of the Credit Rating Process

**The quality and integrity of the processes by which we develop our Credit Ratings are of utmost importance to us.  We have developed policies, practices and procedures over time to govern the rating process and promote quality and integrity in that process.**  We judge the quality of an individual rating based on whether it was formed pursuant to our established processes, rather than on the outcome of that rating, because it is inappropriate to judge any individual opinion on future creditworthiness as right or wrong since a rating is a probability-based assessment.

Below, we discuss important mechanisms we have in place to address the quality and integrity of our rating process and the aggregate performance of our Credit Ratings.

*****

## 4.    Rating Process

Moody's arrives at and maintains our published Credit Ratings through a process that involves robust analysis of the Issuer or obligation to be rated, followed by rating committee deliberation and voting.  This ultimately results in a committee decision on a particular rating that is then disseminated to the market and is **subsequently monitored, as necessary**, to ensure that it continues to reflect Moody's opinion of the creditworthiness of the Issuer or obligation.

*****

## a.    Rating Analysis and Recommendation

**. . .If we believe we have inadequate information to provide an informed Credit Rating to the market, we will exercise our editorial discretion and will either refrain from publishing the opinion or withdraw an outstanding Credit Rating.**

*****

### b.    The Rating Committee

Once the Assigned Analyst has formulated his or her recommendation, it is presented to a rating committee.  The rating committee is a critical mechanism in promoting the quality, consistency and integrity of our rating process. . .

*****

### B.    Independence and Management of Conflicts of Interest

**In 2005, Moody's derived approximately 87% of our revenue from Issuer payments for Credit Ratings**, and virtually all of the remainder from sales of credit research and data products . . . **we recognize that this business model entails potential conflicts of interest that could impact the independence and objectivity of our rating process**, such as those that exist with financial news publications that accept advertising business from companies about which they report.  We also recognize that potential conflicts of interest arising from other sources, such as securities ownership and business and personal relationships, could similarly impact our rating process.  **To maintain our objectivity and independence, and to protect the integrity of our Credit Ratings and rating process, we have adopted policies and procedures at a company level as well as at the level of the individual rating and the Employee, including those discussed in this section.**

*****

**. . .These restrictions further reinforce Moody's objective to avoid any actual or apparent conflicts of interest. . .**

*****

### III.    Differences Between Moody's Code and the IOSCO Code

**Moody's Code is consistent with, and achieves the objectives of, the IOSCO Code.  We have structured the code to track the IOSCO Code as closely as practicable, in order to demonstrate how we have addressed each IOSCO Code provision.**  There are, however, certain differences between Moody's Code and the IOSCO Code, some of wh8ch are textual in nature and some of which are more substantive.  The latter are intended: (i) to include additional provisions to more fully describe our rating process or to address areas not reflected in the IOSCO Code; or (ii) to more closely correspond with our business environment and practices.  In this section of the report, we explain those differences that may be viewed as substantive.

*****

B.    **Differences to Reflect Moody's Business Environment and Practices**

*****

2.    **Fee Discussions with Issuers**

*****

. . .Moody's nevertheless meets the IOSCO Code's objective of minimizing conflicts of interest that may impact a Credit Rating by prohibiting the Analysts with primary analytical responsibility (the Assigned Analysts, who prepare the initial Credit Raring recommendation for rating committee consideration) from participating in fee discussions with that Issuer or its designated agent.

(Emphasis added).

77.    As demonstrated in paragraphs 100 to 179 below, these public statements were false, and the Officer Defendants knew it.  In particular, the assurances of integrity, independence, objectivity, and rigorous analysis contained in such public statements were false, as demonstrated below.

**Moody's Form 10-K for 2006**

78.    On March 1, 2007, Moody's filed with the SEC its Form 10-K for 2006 (the "2006 Form 10-K").  The 2006 Form 10-K made representations identical in words and in substance to those made in the 2005 Form 10-K, *supra*, concerning *inter alia* (i) Moody's provision of purportedly "independent", "high-quality, independent", "credible, independent assessments of credit risk", and "reliable third party ratings"; (ii) the adequacy of Moody's responses to regulators' concerns over Moody's independence, such as the formulation and purported implementation of Moody's Code; and (iii) the sources of moody's current success and future strong growth prospects as stemming from Moody's provision of structured finance ratings.  These representations were materially false and misleading for the same reasons as in the 2005 Form 10-K**,** *supra*.

79.     Additionally, the 2006 Form 10-K represented that:

In April 2006, Moody's Investors Service published its first annual report on the implementation of Moody's Code.  The report discusses policies, procedures and processes that implement the Moody's Code.  The report also describes differences between the Moody's Code and the IOSCO Code and how Moody's believes that the objectives of the IOSCO Code are otherwise addressed.

80.     That representation was materially false and misleading for the same reasons that the Code Implementation Report itself was false and misleading.  It created the false and misleading impression that Moody's had, through implementation of its Code and/or through other means, addressed the objectives of the IOSCO Code, when the opposite was the truth.

**Moody's Annual Report for 2006**

81.     On or about March 22, 2007, Moody's published and distributed to Moody's investors Moody's Annual Report to Shareholders for 2006 (the "2006 Annual Report").  The 2006 Annual Report included a letter to shareholders authored and signed by Defendant McDaniel, in which he stated, in relevant part:

**ETHICS, ATTITUDE, INVESTMENT AND INNOVATION**

**Last year I wrote that preserving and reinforcing the trust that stakeholders—debt issuers, the investment community, employees, governmental authorities and shareholders—have in Moody's is the foundation for our long-term success.**

**Moody's is a "standards" business: public and private sector organizations worldwide rely on the accuracy, stability, consistency and independence of our opinions and services for the contribution they make to fair and efficient financial markets.  For Moody's to continue to meet or exceed these expectations requires that we embrace the demand for trust from several perspectives:**

**Ethics and Attitude:**  Moody's must demonstrate expertise in developing its credit opinions, and must apply those opinions consistently, fairly and objectively. These attributes are points on the compass of **ethics** for this business and traits, I am proud to observe, that are comprehensively embodied by Moody's employees. . .[L]ong-term success must be built not only on a foundation of **ethics**, but also on an attitude of service: behaviors that constantly adjust and align Moody's

**independent**, expert insights with changing market needs and expectations . . . **some will not find independence and "customer focus" to be an intuitive pairing. The nature of an independent expert is to communicate information that will be influential and that, from time to time, recipients will not welcome. To do so with the highest degree of professionalism and with attention to and respect for the perspectives of stakeholders being served is, however, both intuitive and good business.**

*****

## OUR COMMITMENTS TO CUSTOMERS, SHARE-HOLDERS AND OTHER STAKEHOLDERS

I firmly believe that Moody's business stands on the "right side of history" in terms of the alignment of our role and function with advancements in global capital markets. **The markets we serve should continue to grow and the demand for independent expertise in assessing credit and fostering consistent, comparative standards for credit should also grow accordingly.**

**In this paradigm, Moody's goal is to remain the leading authority on credit risk in the global capital markets. To do so, we must continue to differentiate ourselves according to the attributes and behaviors that are important to our stakeholders. For users of ratings, this means not only publishing independent, high-quality credit opinions and analytics . . .**

Raymond W. McDaniel, Jr.
Chairman and Chief Executive Officer

(emphasis added).

82.     The 2006 Annual Report also included additional matter, which stated in relevant

part as follows:

## MOODY'S IS AN ESSENTIAL COMPONENT OF GLOBAL CAPITAL MARKETS

We provide opinions, research and analysis about the creditworthiness of bonds and other debt obligations issued by companies, financial institutions, governments and other borrowers worldwide. The commitment and expertise that Moody's brings to credit analysis contributes to stable, transparent and integrated financial markets. **What we strive to accomplish is straight-forward: to protect the integrity of credit.**

**Moody's has benefitted and should continue to benefit from favorable-long-term capital market trends, including . . . increased adoption of financial**

**technology, primarily through asset securitization.**  These trends are not only propagating new credit markets, but also new classes of securities and new customer groups in both emerging and established markets.  **The result is increasing demand for accurate, comparable credit opinions**, as well as for the tools, data, analysis and insight to understand fully the building blocks of those opinions.  Through the expertise and efforts of Moody's employees, the company is well positioned to meet these ever-increasing demands, while ensuring long-term growth for shareholders.

*****

**We are widely acknowledged by market participants as having a passion for getting to the truth, being committed to clear and transparent standards, illuminating what matters through our research and commentary, and ultimately helping facilitate the availability of credit worldwide.**

**. . . We anticipate that current and prospective investors in Moody's will use our performance against these expectations to judge Moody's continued prospects for long-term growth.**

**STRATEGIES FOR GROWTH**

Moody's is pursuing an integrated growth strategy that includes: expanding internationally, developing new products, entering market adjacencies and enhancing our communications with market participants.

**International Expansion. . .**

**New Products. . .**

**REGULATORY AND COMPLIANCE STRATEGY**

**In addition to communicating with regulatory authorities and policymakers, Moody's also must develop, implement and demonstrate appropriate policies and compliance standards to meet regulatory expectations.  These challenges particularly affect our credit ratings business.  Consequently, we are concentrating appropriate resources and effort on reinforcing our processes** and infrastructure to respond to new reporting and compliance requirements associated with additional oversight.

*****

Also during 2006, Moody's published our first annual report on the implementation of the Moody's Investors Service Code of Professional Conduct.  **The Code of Professional Conduct, which Moody's introduced in 2005 pursuant to the model international code, seeks to enhance market**

**understanding and confidence in our credit ratings by setting out:**

- **Moody's commitment to maintain the quality and integrity of the rating process;**

- **The policies and controls to ensure that we maintain our independence and properly manage potential conflicts of interest; and**

- Moody's responsibilities to investors and issuers.

Moody's Code of Professional Conduct, as well as our compliance report and the Moody's Corporation Code of Business Conduct, is available for review on Moody's website, www.moodys.com.

(Emphasis added).

83.    In substance, the 2006 Annual Report made the same representations as Moody's 2005 Annual Report and was materially false and misleading for the same reasons.

**Misrepresentations Concerning Ratings Methodology**

84.    Moody's management also sought to assure investors and shareholders, as the structured finance market underwent explosive growth driven by relaxed mortgage lending practices,  that its ratings methodology included rigorous review of loan originator standards and practices.

85.    Moody's management recognized that the structured finance market was feeding on an "originate to distribute" credit business model, making scrutiny of origination standards and practices crucial to assessment of credit quality.  As explained by the SEC:

The development of credit risk transfer markets gave rise to an "originate to distribute" model whereby mortgage loans are originated with the intent to securitize them. Under this model, arrangers earn fees from originating, structuring, and underwriting residential mortgage-backed securities (RMBS) and servicing the loans underlying the RMBS, as well as frequently a third set of fees from structuring, underwriting, and managing CDOs composed of RMBS. Moreover, the yields offered by subprime RMBS and CDO tranches (as compared to other types of similarly rated debt instruments) led to increased investor demand for these debt instruments. The originate to distribute model creates incentives for originating high volumes of mortgage loans while simultaneously

reducing the incentives to maintain high underwriting standards for making such loans.

SEC Briefing Paper: Roundtable to Examine Oversight of Credit Rating Agencies (April 14, 2009). The reduction of incentives to maintain high underwriting standards made assessment of the origination characteristics of underlying loans a necessary step—and one expected by investors—in developing structured finance credit ratings.

86. So, the Defendants caused Moody's to provide assurances that this crucial step was in fact a part of its credit rating process. Defendants caused Moody's to publicly state, in at least two separate instances, once in 2003 and again in 2007, that it relied on "originator and servicer quality" in its "analysis of loan performance." Moody's represented that it conducted independent and qualitative assessments of loan originator standards and practices, and took such standards and practices into account as an "integral part" of its credit ratings. For example, Moody's April 1, 2003 report detailing its Moody's Mortgage Metrics model stated:

> Originator and Servicer Practices and Loan Programs Continue to be Captured
>
> The predictive power of borrower quality measures and LTV depends in part on the accuracy of the information submitted. Therefore, it is important to examine the quality of originator practices, particularly efforts to verify data through appraisals, credit checks, and other means. . .One way to assess the quality of an originator's and servicer's practices is to monitor the past performance of its loans. Indeed, the high variability in historical loan performance across originators cannot be explained solely by differences in reported underlying loan characteristics. . .Moody's continues to rely on both quantitative means as well as qualitative reviews to assess originator and servicer quality and their impact on pool performance. These assessments form an integral part of Moody's Mortgage Metrics credit support calculations.
>
> Moody's considers numerous factors when determining the quality and performance of the originator and servicer, including:
>
> - Past performance of an originator's loans;
> - Underwriting guidelines for the mortgage loans and adherence to them:
> - Loan marketing practices;
> - Credit checks made on borrowers;

- Appraisal standards;
- Experience in origination of mortgages. . .

*(Moody's Investors Service, Moody's Mortgage Metrics: A Model Analysis of Residential Mortgage Pools,* April 1, 2003)

87.    Later reports released by Moody's disclosing methodological updates never

disclosed any changes with respect to this aspect of Moody's ratings efforts.  On the contrary,

Moody's made similar representations.  For example:

> The variability [of mortgage performance] is not attributable solely to salient loan attributes. In addition to reported loan characteristics, qualitative elements of the origination and servicing processes influence pool performance.  Moody's considers a number of these elements, including mortgage loan underwriting, quality, underwriting guidelines, appraisal standards and the quality assurance processes.  Underwriting guidelines and exception practices in the sub-prime market can vary substantially across originators, as can servicer quality, with a significant impact on loan quality and performance.  Moody's operational and performance reviews of recent vintages and seasoned pools enable us to incorporate these qualitative elements into our analysis of loan performance. Moody's view of the overall quality of origination, and servicing practices, as well as originators historical performance is applied to assess the pool loss estimates.
> (*Moody's Investors Service, Closed-End Seconds: Recent Performance and Update to Methodology,* April 2, 2007)

*****

> . . . the quality of a lender's loan origination and underwriting practices could ultimately explain significant differences in transaction performance.  As part of the ratings process, Moody's reviews the underwriting guidelines, operations and loan performance history of originators and makes rating distinctions based on its assessment of origination quality.

(*Moody's Investors Service, US Subprime Mortgage Market Update:* September 2007, October 3, 2007)

88.    The problem with these representations and assurances was that they were not

true.  Instead, they were materially false and misleading, creating a false impression of robust,

reliable credit analysis.  In truth, Moody's purported evaluations of originator practices and

standards were a sham.  Moody's admitted as much after subprime mortgage securities and

41

related structured finance instruments began collapsing in value.  During 2007, Moody's made methodological adjustments – with massive consequences for its expected loss determinations – to *begin* to take into account the most obvious measure of originator quality: the comparative actual performance of different originators' loans (which Moody's represented it had been taking into account all along).  During 2008, Moody's revealed that *it had yet to construct any substantial protocol* (of the sort that, according to Moody's *representations*, it had had in place since at least 2003) for assessing originator quality.

89.    On July 12, 2007, Moody's announced its first large wave of downgrades.   These downgrades affected subprime first-lien securities issued during 2006.  In a presentation titled *Moody's Structured Finance Teleconference and Webcast: RMBS and CDO Rating Actions,* Moody's revealed that there had been "significant performance variance among originators." The downgrades reflected the originator performance variations: "four issuers (Fremont Investment & Loan, Long Beach Mortgage Company, new Century Mortgage Corporation and WMC Mortgage Corp.) accounted for 31% of issuance volume but 63% of downgrade volume."

90.    Revealing the absence of such analysis in prior ratings, Moody's stated – in a slide titled "2007 Subprime Methodology Changes" – that it would *henceforwards* consider some originators' loans more risky than others (by as much as 20%) when estimating losses and determining credit ratings.

91.    But Moody's repeated public assurances, detailed above, had led investors to believe that Moody's had already been incorporating such originator information in its ratings. The most obvious and concrete evidence of originator standards is the actual performance of the originator's loans.  Such actual performance data did not have to be requested from the originators, but rather was already and had always been in Moody's grasp.  Had Moody's been

42

actually using this information—as it had led investors to believe—the July 12, 2007 downgrades would not have been necessary; Moody's would already have discounted expected performance (and increased required credit enhancement) in advance.  Including such data in its analysis substantially altered Moody's assessment of expected losses and led to substantially reduced credit ratings.

92.    In a July 24, 2007 report titled *US Subprime Mortgage Market Update*: July 2007, Moody's emphasized that "losses on the 2006 vintage will vary significantly across originators" and that downgrades had been required, in particular, for loans from the same four specific originators: Fremont Investment & Loan, Long Beach Mortgage Company, new Century Mortgage Corporation and WMC Mortgage Corp.   Again revealing that consideration of differing loan performance across originators was a change in its analytical methodology, Moody's stated that:

> **Higher Originator-Specific Loss coverage Adjustments**
> Based on the wide variations in recent performance across originators for otherwise similar subprime loans, Moody's will be increasing the distinction it makes in loss expectations based on the originator of the loans.  Our loss expectations for loan pools from originators that have performed poorly will now be as much as 20% higher than pools with similar credit attributes from originators that have performed well.

(Moody's  Investors' Service, *US Subprime Mortgage Market Update:* July 2007, July 24, 2007).

93.    Moody's Investors Service August 2, 2007 report on its recent methodology changes, titled *US Subprime-Overview of Recent Refinements to Moody's Methodology: July 2007*, made similar reference to Moody's new adoption of originator specific risk weightings.

94.    Moody's October 2007 downgrades of approximately 40% of all subprime RMBS tranches issued and rated during 2006 was again driven by originator-specific matters—*e.g.* loss expectations for certain originators nearly doubled.  In January 2008, Moody's revealed raised

loss expectations a further 50% from the levels disclosed in October 2007.  These belated,

originator data driven downgrades and adjustments reveal that in truth, Moody's earlier

assurances that it was taking into account mortgage originator standards in its credit ratings, were

little more than empty verbiage, concealing the reality: a complete absence of analysis.

     95.    This became clear on March 26, 2008, when Moody's issued a methodological

update titled *Moody's Proposed Enhancements to U.S. Residential Mortgage Securitizations:*

*Call for Comments*.  In that update, Moody's disclosed what it called "more comprehensive

originator assessments."  As Moody's explained:

> More Comprehensive Originator Assessments
> When rating RMBS, Moody's considers and incorporates into its ratings
> assessment the quality and capacity of the originator.  As part of Moody's
> originator assessments, the originator's policies and procedures are reviewed, as
> well as the historical performance of its loans.  Moody's has frequent dialogues
> with originators about origination trends and practices, and conducts on-site
> operations reviews.  For each originator, Moody's reviews the strength of its
> origination channels, the robustness of its policies and procedures, including
> underwriting guidelines, and the quality of its risk management and internal audit
> procedures.  Moody's focuses on the strength of the originator's management and
> staff, technology, disaster recovery, and regulatory and legal compliance.
>
> Going forward, Moody's will conduct a more comprehensive review of each
> originator and will report to the originator our opinion of its strengths and
> weaknesses as well as our view on its financial strength and stability.  Even
> greater emphasis will be placed on the originator's track record – in particular, the
> performance of its loans across different business cycles.
>
> For originator assessments going forward, Moody's is considering loan level
> credit and compliance reviews.  Emphasis will be placed on the procedures
> utilized to ascertain the willingness and ability of the borrower to repay the loan
> as well as procedures used to determine property values.  The reviews will focus
> on specific criteria used by the lender to approve mortgage loans, such as
> borrower income, property appraisal value, debt-to-income ratio and occupancy
> status.

     96.    The contrast between the initial paragraph of this passage (what Moody's had

been doing) and the latter two paragraphs (what Moody's was planning to do in the future) is

striking. The initial paragraph describes vague reviews of policies and procedures, with no real substantive inquiry into underwriting standards or actual loan performance. Such reviews, if they were actually performed, amount to nothing more than window dressing. The latter two paragraphs—setting forth Moody's new approach—describe an actual substantive review of originator standards, practices and historical loan performance. Thus, after telling the market for years that it was conducting a real review of originator quality, and only after the absence of such analysis led to inflated ratings subject to eventual massive, market-wide credit downgrades, Moody's was finally adopting real originator scrutiny as part of its credit analysis.

97.    On April 1, 2008, Moody's made an even more explicit admission that it previously lacked (and still did) any detailed protocol for conducting any real loan originator assessment:

Evaluation of Loan Origination Practices

Finally, we are increasing the depth and breadth of our operations reviews of loan originators. We currently have a detailed protocol for assessing the capabilities and procedures of loan servicers. We plan to develop a similar approach for assessing the credit and quality control processes of loan originators.

Moody's Investors Service, *Updates to Moody's US Structured Finance Rating Methodologies* (April 1, 2008).

98.    Moody's claimed evaluations of originator standards and quality were not the result of "honest error," but were fundamentally devoid of basis. As Moody's subsequent methodological releases made clear, Moody's prior purported efforts with respect to evaluating originator practices and standards were little more than a stage set, built to produce for an audience the appearance of the real thing. By causing Moody's to issue false public assurances of robust structured finance credit analysis, Moody's management—defendants herein— deliberately propped the legitimacy of their unprincipled drive to maintain and grow market

share and to continue to meet and exceed the short-term financial performance goals that drove

their unprecedented levels of incentive compensation.  In so doing, they lulled investors in

billions of structured finance instruments into a false sense of investment quality and security.

## SYSTEMATIC DESTRUCTION OF  MOODY'S RATINGS INTEGRITY

99.     Contrary to Moody's management's repeated public assurances of integrity,

independence, objectivity, and robust rigorous analysis, as set forth above, in reality, from at

least 2004 forward, Moody's management was knowingly degrading ratings quality in order to

capture and maintain structured finance ratings market share.  The Officer Defendants did so

with full knowledge of the risks inherent in this deliberate strategy—risks not only to Moody's

core capital asset, its reputation, but also to the global financial markets.

100.     As *The Wall Street Journal* reported on April 11, 2008, the defendants

transformed Moody's from a minor player with a reputation for "bookishness" and integrity into

a customer-friendly—that is, issuer friendly—contender for market dominance:

> A decade ago, as the housing market was just beginning to take off, Moody's was a small player in analyzing complex securities based on home mortgages. Then, Moody's joined Wall Street and many investors in partaking of the punch bowl. **A firm once known for its bookish culture began to focus on the market share that affected its own revenue and profit.** [Moody's] became willing . . . to switch analysts if clients complained. . . . By the height of the mortgage securities frenzy in 2006, Moody's had pulled even with its largest competitor, rating nine out of every ten dollars raised in these instruments. It gave many bonds its coveted triple-A rating. Profits at the 99-year-old firm, which John Moody started to rate railroad bonds, rose 375% in six years. The share price quintupled. Now, Moody's [is] under fire for putting top ratings on securities that ultimately collapsed in value. Investors, many of whom relied on ratings to signal which securities were safe to buy, have lost more than $100 billion in market value. The credibility of the ratings system is in tatters as new downgrades of mortgage securities come almost weekly. Investigators from Congress, the Securities and Exchange Commission and several state attorneys general are examining the rating firms' practices.

(Emphasis added).

101.    Defendant Brian Clarkson played a major role in the deterioration of the ratings

process.  As *The Wall Street Journal* reported:

> Of the three big rating agencies, **Moody's underwent the deepest cultural
> change** amid the housing boom. At the heart of the firm's gradual transformation
> into a player in the mortgage game was Brian Clarkson, 51 years old, who joined
> the company as an analyst in 1991 and became president last August. . . . * * *
> [I]n the mid-1990s, Fitch and S&P were both rating more mortgage bonds than
> Moody's, in large part because their standards were considered easier. For
> instance, in commercial mortgage-backed securities, Moody's trailed its two main
> competitors by 30 percentage points in market coverage in 1996. That year, Mr.
> Clarkson took over the group at Moody's that analyzed such securities. The firm
> added new analysts **and overhauled its ratings approach, allowing for higher
> ratings in the area.** Within a year, Moody's moved ahead of both Fitch and S&P
> in the sector. **Rivals said that Moody's had cut its standards.** Mr. Clarkson was
> quoted as calling this "sour grapes." He says now that the change in ratings
> approach was the right call. In 1999, Mr. Clarkson took over the part of the firm's
> structured finance business that oversaw bonds and complex securities based on
> home mortgages. Moody's rated just 14% of high-quality "prime" bonds in that
> area the year before he took over, compared with 51% that Fitch rated and 89%
> that S&P rated . . . . **Moody's top home mortgage analyst at the time, Mark
> Adelson, took a cautious approach that resulted in fewer triple A ratings.
> Mr. Clarkson shook things up, firing or reassigning about two dozen analysts
> and hiring new ones who started giving higher grades under a new
> methodology. Mr. Adelson left for an investment bank. In 2001, Moody's
> market coverage was up to 64%.** * * * Mr. Clarkson encouraged his people to
> be more responsive . . . and to find ways deals could get done within Moody's
> methodologies . . . . "Brian Clarkson created a dialogue between Moody's and the
> Street that was good," says Paul Stevenson, a former Moody's executive who now
> works at BMO Financial Group. But "the most recent problem," he says, "is that
> the rating process became a negotiation."

(Emphasis added).

102.    By 2002, this new, "customer friendly" style extended into Moody's CDO

ratings business as well:

> In 2002, Mr. Clarkson's realm extended to the fastest-growing business of CDOs.
> In this complex product, already-sliced-up bonds are further sliced into new
> pieces, based on risk and potential return. Moody's was already rating 90% of the
> dollar value of CDOs. Mr. Clarkson told an analyst he didn't want bad service to
> cause that to slip, people familiar with the matter say. "There was never an
> explicit directive to subordinate rating quality to market share," says Mark

Froeba, a former Moody's analyst who recently started a bond valuation company that may compete with rating firms. "There was, rather, a palpable erosion of institutional support for rating analysis that threatened market share." . . .

103.    Moody's market share in CDO's began to slip,  however, as the market turned to producing more CDO's with highly concentrated asset pools consisting almost entirely of mortgages—Moody's ratings methodology penalized lack of diversification, making  Aaa ratings virtually impossible.  This obstacle to Moody's short term financial results was soon overcome. In the second half of 2004, Clarkson presided over a key ratings methodology change that paved the way for Moody's to capture market share in rating such highly concentrated mortgage backed CDO's:

> In the early days of the millennium, it was almost impossible for one of these bundles of bonds – known as CDOs or "collateralised debt obligations" – to get a triple-A rating from Moody's if the collateral was entirely mortgages. The rating agency had a long-standing "diversity score", which prevented securities with homogenous collateral pools from winning the highest rating. S&P didn't have such a score and neither did Fitch. The result, even with service-oriented Clarkson at the head of the structured finance department, was a steadily dwindling number of mortgage CDOs rated at Moody's.
>
> As the mortgage CDO market continued to grow, Moody's couldn't continue as it had. In 2004, the diversity score was abolished – a decision approved by the Moody's credit committee. The number of mortgage CDOs rated by Moody's rocketed.

*FT.com*, "How Moody's Faltered" (Oct. 17, 2008).  Bloomberg reported in September of 2008 on the details of this key methodology shift:

> Starting in 1996, Moody's used a framework known as the binomial expansion technique for rating CDOs, structured funds consisting of aircraft leases, franchise loans, high-yield bonds, hotel mortgages and mutual-fund fees. On the theory that diversification reduced risk, the BET formula rewarded balanced portfolios and punished concentrations of assets, using a proprietary measurement Moody's called the diversity score.
>
> On Aug. 10, 2004, Moody's Managing Director Gary Witt introduced a new CDO rating method that dispensed with the diversity test and made other adjustments to the evaluation of structured-finance products.

``People were just starting to do deals that were all residential,'' says Witt, 49. He retired from Moody's this year and is now an assistant professor of statistics at Temple University's Fox School of Business in Philadelphia. The BET model ``is not as well suited for the highly correlated portfolios that were becoming common in 2004,'' he says.

The emphasis on diversity turned into an obstacle after the 2001 recession, when some assets plummeted in value. Home mortgages, auto loans and credit-card receivables offered higher returns for CDO managers. As mortgage rates fell and the market boomed, investment firms argued the risks in housing were small.

\* \* \* \*

In September 2005, Witt and colleagues published a follow-up analysis. Compared with the BET, the new model now projected that the likelihood of collateral defaults affecting CDO bonds rated at least Aa could be 73 percent lower at the extreme, in a range of possibilities.

The new comparison was based on a hypothetical investment pool in which 75 percent of the assets were residential mortgage- backed securities, including 30 percent that were subprime.

Moody's could produce a lower default rate by incorporating a decade of ratings stability for structured finance into its assumptions. The average five-year loss rate on U.S. structured finance products between 1993 and 2003 was 1.9 percent, compared with 6.3 percent for corporate bonds, the company had said in September 2004. A drawback was that raters didn't have data going back to the 1920s, as they did on corporate bonds.

In a press release on the report, Moody's said ``structured- finance ratings are broadly comparable in quality to the ratings of corporate bonds.''

\* \* \* \*

Philippe Jorion, 53, a finance professor at the University of California, Irvine, criticizes the Moody's decision to factor ratings stability into its evaluations.

``This uses the output of their model as input into their models,'' Jorion says. ``This type of model is totally out of touch with the underlying economic reality.''

Witt declined in an e-mail exchange to discuss the September 2005 findings or his earlier projections from August 2004.

> ``The effect that had on structures was to create more Aaas,'' says Thomas Priore,
> 39, chief executive officer of Institutional Credit Partners LLC in New York,
> which oversees $13 billion of fixed-income investments.

*Bloomberg*, "Bringing Down Wall Street as Ratings Let Loose Subprime Scourge," (September 25, 2008).  Of course, more "Aaas" is exactly what the investment banks churning out the subprime CDOs wanted—they enabled them to place large volumes of the high-yielding securities with institutional investors whose investment parameters required the high ratings.

104.    Such dubious shifts in methodology, together with the process of "dialogue" and "negotiation" introduced by Clarkson, ultimately undermined the objectivity and reliability of the ratings process.   The April 11, 2008, *The Wall Street Journal* article discussed, as an example, the process for rating a mortgage backed bond underwritten by Bank of America ("BofA"). Most of the securities based on the pool of mortgages would be rated triple-A, but some would be rated lower. The question was, how much would be rated lower – paying higher interest rates and bearing the brunt of any defaults that occurred.  Instead of letting BofA present a structure that would then be rated by objective criteria, Moody's effectively put the matter up for negotiation:

> A rating committee at Moody's voted to require that the issuer put about 4.25% of
> the deal's value in the lower-rated section, to provide extra protection for buyers
> of the top-rated section. But after Bank of America complained and said it might
> go with a different rating firm, Moody's reduced the size of the lower-rated chunk
> slightly – saving the issuer some interest costs – according to people with
> knowledge of the matter.

105.    Thus, Moody's was in essence rating securities that it had played a substantial, if not integral, role in designing—a classic breach of independence and objectivity.  Portfolio Magazine reported in its September 2007 issue as follows (emphasis added):

> Last year, officials from Moody's Investors Service gave a PowerPoint
> presentation to a group of mortgage lenders in Moscow. There were the usual
> arcana about what the ratings mean and how the agency creates them. . . . **But**

**midway through the presentation, Moody's revealed a significant, and ultimately more dangerous, role that the agencies play in financial markets. The slides detailed an "iterative process, giving feedback" to underwriters before bonds are even issued. They laid out how Moody's and its peers help their clients put together complicated mortgage securities before they receive an official ratings stamp. But this give and take can go too far: Imagine if you wanted a B-minus on your term paper and your high-school teacher sat down with you and helped you write an essay to make that grade.** * * * It's becoming clear the rating agencies were far from passive raters, particularly when it came to housing bonds. With these, the agencies were integral to the process, and that could give regulators and critics the ammunition they've been looking for to finally force the Big Three to change. The credit-ratings agencies "made the market."

 (Emphasis added).  The "iterative process" described by *Portfolio Magazine* was central to

Defendant McDaniel's thinking when he later wrote, in a memo for briefing the Moody's Board

(see ¶¶116-122), of competition based on the "lowest credit enhancement that would produce

the highest rating."

106.    Ultimately, the "dialogue" and "negotiation" process described above devolved

into outright ratings "shopping," in which customers were permitted to preview ratings for a

nominal charge and only pay the full rating fee if they selected a Moody's rating for publication.

Mark Adelson, who left Moody's in January 2001, after Clarkson reassigned him out of the

residential mortgage-backed security rating area (he was mentioned in the passage quoted above

from the April 11, 2008 *The Wall Street Journal* article), testified about this phenomenon in

Congressional hearings held in September 2007.   Mr. Adelson explained that:

> Another aspect of conflict of interest, though, that's a little different, is that . . .
> rating agencies can come under a pressure to loosen their standards for a whole
> sector. And this can happen from behavior from the issuer called "ratings
> shopping," where an issuer, let's say, shows a deal [i.e., a proposed structured
> security issuance] to multiple rating agencies and then picks one or two that have
> the easiest standards to rate the deal. Then, the other rating agencies that had
> tougher standards become invisible. And what's more, they don't make any
> money, because the way you make money rating a deal is you rate the deal and
> charge the issuer. So it puts pressure on the rating agencies to loosen their

51

standards. * * * It is indisputable that securitization issuers in the MBS, CMBS, and CDO areas engage in rating shopping. They do so openly.

(Sept. 27, 2007, Emphasis added)

107.    In addition to participating in outright ratings shopping, the Officer Defendants also caused Moody's to remove "uncooperative" credit analysts from accounts when customers complained. On May 23, 2008, in an article titled article, "At Request of Bond Issuers or Bankers, Credit- Rating Firms Switch Analysts," *The Wall Street Journal* reported:

 At Moody's, at least one analyst in the group that rated collateralized debt obligations, or CDOs, was moved off a particular investment bank's deals within the past five years after bankers requested an analyst who raised fewer questions about their deals, according to people familiar with the matter. Another mortgage analyst at Moody's was moved to the firm's surveillance unit after a Moody's official agreed with an investment banker's opinion that the analyst was too fussy, a person familiar with the situation said. The surveillance unit monitors the performance of deals that already have been rated, but doesn't rate new issues. * * * When business was booming, Wall Street firms prized analysts who moved quickly, since investors were eager to pile into the mortgage market by buying bonds. Analysts who raised doubts about a deal could hurt revenues for the rating firm and investment bank.

(Emphasis added).  Thus, analysts who refused to yield to customer wishes were systematically removed from accounts were questions had been raised.

**Defendants' Compensation Rises as Ratings Standards Decline**

108.    What drove the transformation of Moody's from an aloof, independent and objective—even "bookish"—provider of reliable credit analysis to the more "customer friendly," more pliable ratings provider of the last few years?  The answer can be summed up in a single word: Greed.

109.    During the 1990s, Moody's was a division of a much larger conglomerate-- financial publisher Dun & Bradstreet, which included the businesses now known as RH Donnelly, Dun & Bradstreet, Moody 's, Cognizant and AC Neilsen. Through a spin-off in 1996,

the Cognizant and AC Neilsen businesses were separated from the parent holding company, and,

through a spin-off in 1998, the RH Donnelly business was separated.  Finally, in 2000, through

yet another spin-off transaction, Moody's became an independent, publicly traded company.

Going public changed everything:

> The agency was floated as a public company in 2000 – spun out of the financial publisher Dun & Bradstreet. **As one former Moody's staffer recalls: "The change was just precipitous. There was suddenly a concentration on profits. Management got stock options. It's true there was a big personality shift in the company – lots of cozying up to clients went on."**
>
> "We were lily white," says Ann Rutledge of her time working in the Moody's structured finance division in the mid-1990s. "But then the centre of gravity in Moody's shifted. Moody's went public."
> Soon there were stories of analysts going skydiving with clients; of structured finance experts and bankers on weekend getaways together; of golf outings and karaoke nights (Clarkson was known as a fan of the latter). Analysts at Moody's now picked up their phones.

*FT.com*, "How Moody's Faltered" (Oct. 17, 2008) (Emphasis added).

110.    The conversion of Moody's to an independent public company meant that short

term financial goals of its dominant ratings business would drive an accumulation of wealth by

its top executives.  Thus, many of the Officer Defendants received enormous profits from

degrading the quality and integrity of the Company's credit ratings.  According to the April 11,

2008 *The Wall Street Journal* report:

> Employees, though paid a fraction of what they could earn on Wall Street, sometimes **grew wealthy from Moody's surging share price and their stock options.** According to a regulatory filing, Mr. Clarkson's compensation totaled $3.8 million in 2006. **The firm's chief executive, Raymond McDaniel, earned $8.2 million that year, more than twice what his predecessor made in 2000.** Moody's says the rise in their compensation reflected growth in the overall business, not just the mortgage area, and that **much of the rise came from the increasing value of stock options that had been granted years before.** By early 2007, some Moody's analysts were growing worried about the market for securities backed by subprime mortgages. **But Mr. McDaniel told a group of investors in May 2007: "The good-news story for us" includes "very strong growth coming out of our largest business, which is the structured-finance**

**business. It is both large and a significant growth engine for the company.”**
Despite some analysts' concerns, Moody's rated about 94% of the $190 billion in
mortgage-related and other structured-finance CDOs issued in 2007, the second
busiest year ever.

(Emphases added.)

### "We Drink The Kool-Aid"—the Officer Defendants Knew Exactly What was Happening

111.    The Officer Defendants' destruction of the integrity of Moody's credit rating

process was knowing, willful and deliberate.  They knew not only what was happening and its

implications for the Company, but also the potential consequences for the financial markets.

Their knowledge is most forcefully demonstrated by a series of documents recording thoughts of,

or statements made by, defendants McDaniel and Clarkson in the fall of 2007, after the collapse

of the credit markets had begun.  These documents did not become public until October of 2008,

in connection with Congressional Hearings examining "Credit Rating Agencies and the Financial

Crisis."

112.    One of these documents is a transcript of an internal Moody's management

meeting on September 10 2007.  McDaniel participated in this "Managing Director's Town Hall"

at which he told fellow high-ranking employees:

 The purpose of this town hall … [is] so that we can speak as candidly as possible
about what's going on in the subprime market. …

We do have some prepared slides that we'll probably depart from these as  we go
along because there are a number of messages that we just frankly didn't want to
write down.

[W]hat happened was, it was a slippery slope. … What happened in '04 and '05
with respect to subordinated tranches is that our competition, Fitch and S&P, went
nuts. Everything was investment grade. It didn't really matter. … We tried to alert
the market. We said we're not rating it. This stuff isn't investment grade. No one
cared because the machine just kept going.

Thus, defendant McDaniel and the other members of Moody's senior management were aware in 2004, that their competitors were issuing questionable investment grade structured finance ratings.   They nevertheless decided in 2004, as alleged above, to eliminate the "diversity score" aspect of the ratings process so Moody's could compete for more CDO ratings.

113.    Defendant Clarkson also participated in the September 2007 Town Hall.  He candidly admitted (1) that he knew, even as he pressed to expand Moody's structured finance market share, that the underlying mortgage loans carried huge risks, (2) that Moody's was not doing an good job of monitoring mortgage originators underwriting quality, and (3) that Moody's was accepting representations and warranties of legal compliance that it knew to be false:

> At the end of the day,  . . . we didn't do a very good job of measuring the magnitude {of risk in housing loans].  I've been saying that in private meetings. Obviously I'm not going to say that to the press, but what happened was what we did, we talked about early on how we actually sort of changed our ... level with respect to subprime mortgages, 30-10 over three years. We saw the risk coming. We identified the risk. We just missed the magnitude.
>
> ****
>
> The only thing that we sort of controlled a little bit was the cheap credit and sort of the underwriting standards that sort of went lack. We should have done a better job of monitoring that.
>
> ****
>
> [T]he bad underwriting, the cheap credit, and housing prices were there in '03, '04, '05.  What happened was that the music stopped in '06.
>
> ****
>
> We were on notice that a lot of things that we relied on before just weren't true. The problem is, what are you going to do?  At the end of the day, we relied on reps and warranties that no loans were originated in violation of any state or

federal law. We know that's a lie. If none were originated in violation of any predatory lending law, we know that's a lie.

114.    The following day, a member of the Moody's management team commented as follows:

> We heard 2 answers yesterday: 1. people lied, and 2. there was an unprecedented sequence of events in the mortgage markets. As for #1, **it seems to me that we had blinders on and never questioned the information we were given**. … As for #2, it is our job to think of the worst case scenarios and model them. … **Combined, these errors make us look either incompetent at credit analysis, or like we sold our soul to the devil for revenue, or a little bit of both.**

 (Emphasis added).

115.    Another key internal Moody's document revealed in October 2008 is a written script prepared by defendant McDaniel on October 21, 2007, of a report he planned to make to the Moody's Board.  He titled this document "Credit Policy Issues at Moody's Suggested by the Subprime/Liquidity Crisis."  McDaniel's written remarks confirm his full awareness that Moody's was operating in a market where competition was based not upon legitimate factors of quality, price or service.  Instead, the ratings agencies had become captives of the structured finance securities arrangers and underwriters who directed business to the rating agencies that provided the most lenient rating standards:

> In an increasing number of markets, Fitch is an acceptable substitute for either S&P or Moody's. In other markets, any one of the three is enough. With the loosening of the traditional duopoly, how do rating agencies compete?

> Ideally, competition would be primarily on the basis of ratings qualitv, with a second component of price and a third component of service.  Unfortunately, of the three competitive factors, rating quality is proving the least powerful given the long tail in measuring performance. Were that the extent of the problem -that it is hard to measure quality and hence price and service are disproportionately weighted -- it would pinch profitability forcing rating agencies to spend more on service and take less in fees. But that is no different than for most other businesses and we can cope. The real problem is not that the market . . . underweight[s] ratings quality but rather that in some sectors, it actually penalizes quality by awarding rating mandates based on the lowest credit enhancement needed for the

highest rating. Unchecked, competition on this basis can place the entire financial system at risk. It turns out that ratings quality has surprisingly few friends: issuers want high ratings; investors don't want ratings downgrades; short-sighted bankers labor short-sightedly to game the ratings agencies for a few extra basis points on execution. . . .

116.    These private, candid written  remarks also establish that McDaniel and Moody's senior management believed that Moody's had no choice but to compete on this basis, and that this dilemma had persisted for years:

> **Moody's for years has struggled with this dilemma. On the one hand, we need to win the business and maintain market share, or we cease to be relevant.**
>
> **On the other hand, our reputation depends on maintaining ratings quality (or at least avoiding big visible mistakes).**

(Emphasis added).  The dilemma was that, in pursuing ratings business by compromising ratings quality standards, one could only hope that there would be no "big visible mistakes."  But such big visible mistakes were inevitable given the Individual Defendants pursuit of business regardless of the risks to investors and, ultimately, to the Company as well.

117.    Defendant McDaniel's remarks also candidly admit that Moody's senior management (McDaniel included) did nothing to manage the obvious risks to Moody's ratings quality and reputation, offering no guidance to the analyst managers as they pursued ratings business:

> For the most part, we hand the dilemma off to the team [Managing Directors] to solve. As head of corporate ratings, I offered my managers precious few suggestions on how to address this very tough problem, just assumed that they would strike an appropriate balance. I set both market share and rating quality objectives for my [Managing Directors], while reminding them to square the circle within the bounds of the code of conduct.

118.    Defendant McDaniel noted the Company had "erected safeguards to keep teams from too easily solving the market share problem by lowering standards." But then he admitted that these purported "safeguards" were ineffectual, stating: "This does NOT solve the problem."

119.    Defendant McDaniel then strongly implied that in reality, and despite any purported internal "safeguards," the Company's structured finance ratings had become a game of balancing competing market interests rather than accurately gauging the risk in a security: "The RMBS and CDO and SIV ratings are simply the latest instance of trying to hit perfect rating pitch in a noisy marketplace of competing interests."

120.    Addressing the topic "Rating Erosion by Persuasion," Defendant McDaniel went on to state:

> Analysts and [Managing Directors] are continually "pitched" by bankers, issuers, investors – all with reasonable arguments – whose views can color credit judgment, sometimes improving it, other times degrading it (**we "drink the kool-aid"**).

(Emphasis added).  Defendant McDaniel ended his comments on this point with a classic understatement: "Coupled with strong internal emphasis on market share & margin focus, this does constitute a 'risk' to ratings quality."

121.    Defendant McDaniel's penultimate comment candidly admitted that Moody's management had simply been unable to implement an effective way to protect ratings quality, and at the same time had been unable to bring itself to forgo structured finance ratings market share despite the fact that it could only be achieved and maintained by compromising on ratings quality:

> From a credit policy perspective, we want to be in a position to JUST SAY NO to a market opportunity, when imperative to do so from a quality perspective. We have done that in the past (e.g. net interest margin securitizations; capital notes on SIVs; Canadian CP liquidity arrangements). How to do it more aggressively without simply exiting whole market sectors is an unsolved problem.

Placed in context, Defendant McDaniel was saying that the Officer Defendants had decided not to "simply exit a whole market sector" despite their complete awareness that such competition was  resulting in a degradation of ratings quality that was "plac[ing] the entire financial system at risk."

122.    Together, the September 2007 Town Hall document and Defendant McDaniel's October 21, 2007 board presentation script establish that the Officer Defendants were fully aware of the degradation in Moody's ratings quality in the structured finance market as it was occurring.  First, defendant McDaniel's knowledge over a substantial period of time, dating back to his pre-CEO tenure as "head of corporate ratings" is plainly reflected in his explicit written statements, including the candid statement that Moody's had been struggling with the ratings degradation dilemma "for years."

123.    Second, defendant Clarkson's knowledge is reflected both in his comments at the Town Hall and in strong circumstantial evidence: his senior executive level responsibility for day-to-day management of the structured finance ratings business.  Indeed, virtually everything that defendant McDaniel knew about the structured finance ratings market was likely reported to him by, or at least through, defendant Clarkson.

124.    Third, defendant Kirnon's knowledge is necessarily indicated by the same circumstances—his position as former head of Moody's global Structured Finance business reflects that he, like defendant Clarkson, had day to day senior management responsibility for the structured finance ratings business.  In this role, he oversaw the commercial real estate, asset finance and derivatives ratings teams on a global basis. Previously, as a senior managing director, defendant Kirnon was responsible for the global derivatives, global managed funds and

U.S. commercial mortgage-backed securities (CMBS). Prior to this role, he was a group

managing director, responsible for a number of Moody's domestic structured finance businesses.

126.    Fourth, defendant Kanef's pre-October 2007 role as Group Managing Director of

the Moody's U.S. Asset Finance Group, responsible for ratings of residential mortgage-backed

securities, implicates his knowledge of ratings degradation in the structured finance market for

the same reasons.

126.    Fifth, defendant Dering's role as head of compliance constitutes strong

circumstantial evidence of her knowledge.  Dering, as head of compliance, was responsible for

assessment of compliance risks in the structured finance ratings business and for designing

policies and procedures to mitigate such risks.  In other words, she was the point person for

designing and implementing purported "safeguards" to which defendant McDaniel referred in his

board presentation script.  She was also responsible for assessment of the effectiveness of these

purported safeguards once they were in place.  Thus, defendant Dering knew better than anyone

the purported safeguards did "NOT solve the problem."  Her unexplained sudden resignation in

October of 2007, as the market was just beginning to get a glimpse of the depth and extend of

wrongdoing at Moody's, is an additional piece of circumstantial evidence of her knowledge of

and responsibility for the degradation of Moody's structured finance ratings.

127.    Sixth, defendants Huber and McCabe, as the principal financial and accounting

officers of the Company, respectively, worked closely with senior operations management and

were no doubt apprised of competitive conditions in the structured finance market, including the

pressure to degrade ratings quality.

128.    Moreover, the Officer Defendants received, throughout the **relevant time frame**,

internal warnings regarding the debasement of the credit rating system, as well as external

warning and complaints from institutional investors.  Jerome Fons, the former head of the

Company's Fundamental Credit Committee, told a Congressional committee on October 22,

2008:

> Mrs. MALONEY: Mr. Fons, you used to work at Moody's. This document
> [McDaniel's October 21, 2007 board presentation script] appears to contradict
> years of public statements by Mr. McDaniel and other Moody's officials that they
> are not pressured by the issuers. And I'd like to ask you, Mr. Fons, are you
> surprised by this kind of assessment that Mr. McDaniel would be making to his
> board of directors?
>
> Mr. FONS: **No, I'm not surprised at all. I mean, this totally reflected my views
> and the views of many others at the firm. Many, of course, didn't want to
> hear this.** One problem with this whole statement is that the emphasis is on rating
> quality, and in my view that is something that has never really been clearly
> articulated by the agencies or by the regulators or by anybody else. We talk about
> ratings quality, but there is no clear definition of what that means, and without a
> firm target there, we don't have much to go on. But clearly what he is referring to
> is accurate ratings here. And we definitely knew that the investors were conflicted
> in what they wanted in terms of having stable ratings on bonds once they held
> them, that issuers are conflicted and they wanted high ratings on their securities,
> whether or not they deserved them, and that bankers were taking advantage of the
> competition in the industry to game the system.

(Emphasis added).

> 129.    Similarly, Mr. Fons also testified, in part, as follows:

> Ms. MCCOLLUM: In this e-mail Moody's officials described a tough phone call
> with the chief investment officer at Fortis Investments. The Moody official wrote
> that the Fortis investor requested to speak to someone very senior very quickly.
> She said she was extremely frustrated and had a few choice words, and here's
> what she told the Moody official: If you can't figure out the loss ahead of the fact,
> what's the use of your ratings? You had legitimized these things, referring to
> subprime and ABS, that's asset-backed CDO assets, as leading people into
> dangerous risk. Quote again, "If the ratings are BS, the only use in ratings is to
> compare BS relatively to BS." Mr. Fons, you used to work at Moody's, so my
> question for you is going to be that's a pretty damning indictment of the entire
> system, to use the phrase, and I quote her again, to use only ratings "compared BS
> relatively to BS." So my question to you, does Fortis have a point?
>
> Mr. FONS: **Absolutely. The deterioration in standards was [palpable]. As I
> said, evidence first arose at least in 2006 that things were slipping, and the
> analysts or the managers for whatever reason turned a blind eye to this, did**

**not update their models or their thinking and allowed this to go on.** And what these investors are most upset about clearly, is the fact that a triple-A was downgraded. Triple-As had historically been very stable ratings through time. And so there was an implicit compact, if you will, that the triple-A was to be something that was to last at least for several years without losing that rating. And when you see something go from triple-A to a low reading in such a short period of time, clearly that's evidence of a massive mistake somewhere. So she's venting her frustration.

Ms. MCCOLLUM: So the triple-A is like the gold standard?

Mr. FONS: It is, yeah. It's the brand. That's what Moody's is selling.

(Emphasis added).

130.   Mr. Fons issued a searing indictment of Defendants and other managers at

Moody's, who sacrificed their duties to the Company and its shareholders in the pursuit of profits

at all costs:

> Mr. SARBANES: [Turning] to the question of, you can change procedures, you can change controls, you can change people that protocols, et cetera, but why should we trust the same who ignored these warnings to fix the problem in a way means it's not going to happen going forward? So I think that's what you're getting at. If you could just speak to that a little more specifically, I'd appreciate it.
>
> Mr. FONS: I think that's exactly what I meant, that you still have the same overall incentives in place, you still have the same structures; and as you said, they should have been doing those things in the first place. These are not reforms; these are just doing business properly and doing them better. So at the governance level you need the board of directors who are actually acting in shareholders' interest and that interest is preserving the franchise and preserving the reputation of the firm. And I didn't see that happening. They weren't interested in hiring good businessmen and seeing a business run; and as I said, that's why I have advocated wholesale change at those levels.

(Emphasis added).

## The Director Defendants Utterly Abdicated Their Oversight Responsibilities

131.   Mr. Fons's testimony raises the fundamental question: Where was the Moody's

Board of Directors while all of this was going on?

132.    The answer is that the Director Defendants breached their duty to act in good faith to oversee Moody's business and affairs, recklessly allowing management to debase the ratings process and destroy the Company's reputation.

133.    The Director Defendants had a fundamental duty to exercise good faith and due care in the oversight and management of the business and affairs of Moody's.  These duties included the duty to maintain systems of information and reporting designed to effectively bring to their attention the information necessary for them to oversee management's assessment and management of risks that are material to the business of the Company.  These duties also included the duty to actually monitor such systems of information and reporting.

134.    Moreover, each of the Director Defendants, other than McDaniel, was a member of Moody's Audit Committee.  The Company's Amended Audit Committee Charter, as of 2006, provided that:

> The Audit Committee's primary purpose is to represent and assist the Board of Directors in fulfilling its oversight responsibilities relating to: (a) the integrity of the Company's financial statements and the financial information provided to the Company's shareholders and others; (b) the Company's compliance with legal and regulatory requirements; (c) the Company's internal controls; and (d) the audit process, including the qualifications and independence of the Company's principal external auditors (the "Independent Auditors") and the performance of the Company's internal audit function and the Independent Auditors.

135.    The Amended Audit Committee Charter specifically set forth the Director Defendants oversight duties relating to internal controls, compliance, risk management, and standards of conduct:

> The Committee shall receive reports regarding, and review with the Independent Auditors, internal auditors and management, the adequacy and effectiveness of: (a) the Company's internal controls, including any significant deficiencies in internal controls and significant changes in internal controls reported to the Committee by the Independent Auditors or management; and (b) the Company's disclosure controls and procedures.

The Committee shall oversee the Company's compliance program by reviewing: (a) legal and regulatory compliance matters; and (b) the Company's policies and procedures designed to promote compliance with laws, regulations, and internal policies and procedures, including the Company's code of conduct. This will be facilitated through the receipt of reports from management, legal counsel and third parties.

The Committee shall review: (a) the Company's policies with respect to risk assessment and risk management, and contingent liabilities and risks that may be material to the Company; and (b) major legislative and regulatory developments which could materially impact the Company. This will be facilitated through the receipt of reports from management, legal counsel and third parties.

136.    The Company's Amended Audit Committee Charter also required the Director Defendants to review the periodic public disclosures of the Company.

137.    The Company's Amended Audit Committee Charter, as it existed in 2004, 2005, 2007 and 2008, was substantively identical to that which existed as of 2006.

138.    By accepting appointment to serve on the Audit Committee, the Director Defendants undertook to fulfill the requirements of its charter in good faith.

139.    The events that have transpired, as alleged herein, demonstrate that the Director Defendants, other than defendant McDaniel, breach their duty of good faith in that they knowingly

(a)    Failed entirely to ensure that the Company had in place a system of information and reporting designed to bring important matters of internal control, compliance, and risk management to their attention on a timely basis; or

(b)    Having ensured that such system of information and reporting existed, knowingly failed to monitor it.

140.    Such failure prevented the good faith exercise of the Director Defendants oversight duties, and each of the Director Defendants was aware that he or she was breaching his or her fiduciary duty.

**The End Result: Moody's Issued the Worst Ratings in the Industry**

141.    As the above allegations demonstrate, the Moody's board utterly abdicated its oversight duties, permitting self-interested management to pursue structured finance ratings market share, and short-term financial results, by degrading the quality of Moody's ratings.  For their part, the Officer Defendants knowingly and deliberately subverted the ratings process in the pursuit of short term financial results and corresponding personal enrichment, all the while assuring the market of Moody's integrity, independence, objectivity and substantive rigor.

142.    The result of these breaches of duties was to transform a formerly respected, objective provider of high quality credit ratings—indeed, arguably the toughest and most conservative rating agency before it was transformed by McDaniel, Clarkson, and company into a "customer friendly" investment bank collaborator –into the ratings industry's worst offender, when it came to compromised ratings of subprime mortgage backed securities.   As *Bloomberg* reported on April 2, 2008:

> Moody's Investors Service is the least accurate assessor of the risks of subprime-mortgage securities among the three largest credit-rating companies, while Fitch Ratings is the best, according to UBS AG.
>
> Moody's assigns Caa2 or lower ratings to just 12 percent of the 292 bonds underlying benchmark Markit ABX indexes that UBS analysts expect to default. Both Fitch and Standard & Poor's tag 57 percent of the bonds with equivalent rankings, according to a report from the New York-based analysts yesterday. A rating of Caa2 or CCC is eight levels below investment grade.
>
> ``Moody's trails badly,'' UBS analysts including Laurie Goodman and Thomas Zimmerman wrote.
>
> * * *
>
> Fitch was rated the most accurate also because it doesn't have AAA ratings on any securities tracked by ABX indexes that UBS expects to default, while Moody's has 35 ranked the equivalent Aaa and S&P has 24 with top ratings, the report said. Fitch also rated the fewest ABX subprime bonds -- only 200 of the 400 rated by

Moody's and S&P -- meaning it was the ``most conservative'' when assessing new deals in 2005, 2006, and 2007.

**The Truth Begins to Emerge**

143.    The inevitable result of massive degradation of structured finance ratings quality at Moody's was a massive wave of ratings downgrades.  Although the Officer Defendants held out as long as possible, riding the wave as the investment banks churned out mortgage backed and mortgage related structured finance instruments at an increased pace in the first half of 2007, by summer the worsening subprime mortgage default rates forced the rating agencies to act.  The downgrades began in July 2007, and, predictably, created havoc in the credit markets, which in turn created mayhem in the stock markets.  As the markets roiled, intense government attention was focused on Moody's and its competitors.

144.    Beginning earlier in 2007, delinquency and foreclosure rates for subprime mortgage loans dramatically soared, creating turmoil in the markets for RMBS backed by such loans and CDOs linked to such securities.  As the performance of these securities continued to deteriorate, Moody's was forced to downgrade the ratings of a significant number the securities.

145.    On July 12, 2007, Defendants caused Moody's to announce that the Company was downgrading 399 mortgage-backed securities issued in 2006 and reviewing an additional 32 mortgage-backed securities for downgrade, affecting approximately $5.2 billion worth of bonds. The same day, Defendants also disclosed that the Company had downgraded 52 bonds issued in 2005.

146.    By December 2007, Moody's had downgraded "more than half the 2006 subprime residential-mortgage-backed securities it had rated, including a whopping 97% of the slices, or tranches, it deemed single-A or below." (*Barron's Online*, December 24, 2007.

147.    All told, Moody's has downgraded over 5,000 previously issued ratings on mortgage-related bonds and CDOs. These ratings cuts have forced sell-offs of the securities, and triggered the massive wave of balance sheet write downs that have toppled major investment banks Bear Stearns and Lehman Brothers, forced the sales of Merrill Lynch, Wachovia and Washington Mutual, dried up credit markets and sent the global securities markets into a tailspin.

148.    In addition to the foregoing, on August 10, 2007, there were a series of public reports detailing the conflicts of interest in Moody's structured finance business and suggesting that the conflict might have caused inaccurate and inflated ratings by Moody's.

149.    On or about August 20, 2007, Senator Richard Shelby, the head of the U.S. Senate Banking Committee, remarked that credit rating agencies must shoulder some responsibility for the subprime mortgage crisis. Reports indicated that Moody's was facing Congressional scrutiny for an "inherent" conflict of interest in helping to construct mortgage-backed securities and then opining on their creditworthiness.

150.    As a result of the spreading contagion caused by Defendants' corrupted ratings, the SEC initiated examinations of Moody's and its primary competitors in late August 2007, and the Attorney General for the State of New York, Andrew Cuomo, added Moody's and other rating agencies in his investigation of the mortgage industry.

151.    On September 21, 2007, Defendants caused Moody's to reclassify many of its "midprime" ratings, further evidencing the inaccuracy and unreliability of its previous rating system.

152.    On September 26 and 27, 2007, there were hearings in Congress concerning the role of Moody's and other rating agencies in the credit crisis.

153.    At the Congressional hearings, several present and former Moody's personnel, including Defendants, faced pointed questions from angry members of Congress.

154.    On November 20, 2007, Moody's filed a Form 8-K announcing the defendant Dering, its Executive Vice President, Global regulatory Affairs and Compliance, had suddenly resigned.  Defendant Kanef was appointed to the chief compliance officer role to replace defendant Dering.

155.    On February 7, 2008, Defendants released Moody's results for the fourth quarter and full year 2007. The results were dismal and included: (a) a 54 percent profit decline and a 23 percent revenue decline, due in large part to (b) a 25 percent ratings revenue decline, which in turn was driven by (c) a 53 percent reduction in structured finance revenue. Given such steep declines in ratings revenue and especially structured finance ratings revenue, Defendants disclosed that they expected the Company's revenues to decline during 2008 "in the low double digit percentage range."

156.    In the earnings announcement, defendant McDaniel stated:

 Moody's confronted unprecedented challenges in 2007 as credit problems that began in the U.S. housing sector affected important parts of our ratings business globally. . . . The severity and protracted nature of current credit market dislocations confirms that the challenges of 2007 will persist well into 2008. Moody's is responding to these conditions by providing more extensive research and credit evaluation tools. We are also working closely with market participants on information transparency in order to restore confidence and to support more orderly credit market operations as quickly as possible.

157.    The following day, February 8, 2008, York Attorney General Cuomo issued a public statement as follows:

 "The supposed reforms announced . . . by Moody's on Tuesday are too little too late. Both S & P and Moody's are attempting to make piece-meal change that seem more like public relations window dressing than systemic reform. My Office will continue its active investigation of the mortgage industry and the role played by the ratings agencies in the mortgage meltdown."

(Emphasis added).

## Defendant Clarkson Parachutes Out to a Soft Landing

158.    On May 8, 2008, *The Wall Street Journal* reported that defendant Clarkson had

resigned his position at Moody's.  The article stated:

> Mr. Clarkson's exit, effective by July, marks the highest-profile casualty to date in
> the controversy over the **complicity of credit-rating firms in the subprime
> meltdown.** Mr. Clarkson, 52 years old, once ran the group overseeing mortgages
> and other structured-finance products, and his stature rose as Moody's became a
> major player in analyzing complex securities based on home mortgages.
>
> Last year, he was promoted to president and chief operating officer of the firm,
> the largest unit of **Moody's** Corp. But his standing was tarnished when many of
> the products he oversaw suffered heavy losses.
>
> "Challenging credit-market conditions, combined with Moody's role and function
> in those markets, have created scrutiny and criticism from numerous external
> sources about various aspects of our business," Moody's Corp. Chief Executive
> Raymond McDaniel said in a letter to employees Wednesday.
> "While much of the criticism aimed at Moody's is unfounded, Brian believes that
> the time is right for new leadership to drive forward the changes we have been
> making in recent months," the letter said.
> In recent weeks, Mr. Clarkson discussed with Mr. McDaniel whether a change in
> leadership was needed to restore confidence, according to a person briefed on the
> discussions. Moody's said Mr. Clarkson made the decision to leave, though Mr.
> McDaniel informed the board, a person familiar with the matter added.

(Emphasis added).

159.    Despite defendant Clarkson's responsibility for the degradation and compromise

of Moody's ratings quality in the structured finance market, the Director Defendants failed to

hold him accountable, instead granting favorable terms of separation:

> In addition to receiving 52 weeks of salary and benefits continuation under the
> Moody's Career Transition Plan as described in Moody's 2008 Proxy Statement
> and participation in the 2008 Executive Performance Incentive Compensation
> Plan (under which Mr. Clarkson will be paid a prorated bonus in the first quarter
> of 2009 representing 7/12 of his target bonus), Mr. Clarkson is a participant in
> Moody's Supplemental Executive Benefit Plan. The SEBP features a "cliff
> vesting" provision pursuant to which any SEBP participant who terminates

employment with the Company before both reaching the age of 55 and accumulating 10 years of service will have his SEBP benefits reduced by 60% of the otherwise accrued benefit. The board of directors of the Company has exercised its authority to waive the reduction in benefits for pre-age 55 termination and grant Mr. Clarkson the full value of his accrued SEBP benefit, otherwise in accordance with the plan terms.

The Board also provided that Mr. Clarkson's departure from the Company will be treated as a retirement under the Company's equity plans. As a consequence, his restricted stock grants will vest in full and all restrictions on such shares will lapse upon his termination and his unvested stock options (other than the grant he received in 2008) will continue to vest and (together with his vested stock options) be exercisable for five years from the date of termination or, if shorter, the remaining stated term of each option.

On information and belief, these favorable terms of separation are worth millions of dollars to defendant Clarkson.

## The CPDO Cover Up

160.    Defendant Clarkson's exit immediately preceded revelation of the extent to which Moody's management was driven to avoid what defendant McDaniel referred to in his October 2007 board report script as "big visible mistakes."  The extent and severity of mismanagement at Moody's became painfully apparent on May 20, 2008, when  the *Financial Times* reported in an article entitled "Moody's Error Gave Top Rating to Debt Products," that the Company had incorrectly awarded triple-A ratings to billions of dollars worth of certain asset-backed securities, known as constant proportion debt obligations ("CPDOs"), and that although senior officers had known of this as of early 2007, they declined to correct the errors:

Internal Moody's documents seen by the FT show that some senior staff within the credit agency knew early in 2007 that products rated the previous year had received top-notch triple A ratings and that, after a computer coding error was corrected, their ratings should have been up to four notches lower. News of the coding error comes as rating agencies are under intense pressure from regulators and governments, who see failings in the rating of complex structured debt as an integral part of the financial crisis. While coding errors do occur there is no record of one being so significant. Moody's said it was "conducting a thorough review" of the rating of the constant proportion debt obligations – derivative instruments

conceived at the height of the credit bubble that appeared to promise investors very high returns with little risk. Moody's is also reviewing what disclosures of the error was made.

The *Financial Times* stated that this coding error affected "billions" in CPDOs.

161.    The article went on to reveal a deeply troubling aspect of Moody's management's reaction to discovery of the error—they sought to hide it:

> It was nothing more than a mathematical typo – a small glitch in a line of computer code. The impact of the "bug" Moody's analysts discovered was, nevertheless, significant.
>
> When the model was re-run it became clear that the CPDOs could no longer achieve triple A ratings, according to documents seen by the FT.
>
> The results showed that early CPDOs might lose between 1.5 and 3.5 notches in the Moody's Metric, an internal measure, which equals up to four ratings notches. Some Moody's analysts had concerns. With so many transactions from other banks in the rating pipeline, the code could not be left as it was. The bug was corrected.
>
> At the same time, the documents record that Moody's staff looked at how they could amend the methodology to help the rating.
>
> Some of the most senior managing directors in Moody's European structured finance division were involved in meetings to discuss the updating of the methodology for rating CPDO-like transactions in February.
>
> The staff also looked at reducing assumptions about the future volatility of the credit markets so that Moody's model only anticipated minor moves in credit indices over the next 10 years.
>
> This had the effect of reducing the negative impact on the ratings of correcting the code error.

162.    *Bloomberg* reported that $4 billion worth of CPDOs were affected, and that some had fallen in value by as much as 90 percent.  *Forbes* reported that Moody's management left the erroneous AAA ratings in place until they could be reduced based on market declines, without calling attention to the original error, and that investors had suffered massive losses:

> The products remained AAA until January this year when, amid general market declines, they were downgraded several notches. In the recent turmoil, those who bailed out of CPDOs have lost up to 60 percent of their investment, the FT said.

163.    On May 21, 2008, Senator Charles Schumer and Representative Paul Kanjorski stated in a letter to the Securities and Exchange Commission ("SEC") that "[t]he news today about Moody's greatly concerns [us] . . . . Moody's must come forward immediately to explain and clarify what happened. . . . We also want to know when the Commission learned of these problems and whether it might have affected Moody's application under the 2006 law for continued designation as a [NRSRO]."

164.    That same day, Defendants caused Moody's to disclose that it had retained the law firm of Sullivan & Cromwell and initiated a "thorough external review" of its rating process for the securities. Defendants represented that they "would take any appropriate actions after the review is completed."

165.    On May 26, 2008, it was belatedly disclosed that the SEC had commenced an investigation into Moody's business practices. *Reuters* reported as follows:

> The U.S. Securities & Exchange Commission (SEC) is looking into the workings of the three main credit rating agencies, prompted by their handling of the subprime crisis and a report of computer errors at Moody's . . . . "We sent letters to Moody's, Standard & Poor's and Fitch asking for them to get back to us on aspects of their methodology," said Erik Sirri, director of the SEC's trading and markets division. "We asked them to explain the policies and procedures used to detect errors in ratings of structured finance products and to tell us about any errors that they found in structured finance products over the last four years, including steps that they followed to correct the problem," he added. * * * The Financial Times reported last week that Moody's had wrongly assigned triple-A ratings to complex European debt products called constant proportion debt obligations, or CPDOs. Moody's said it rated 44 European CPDO tranches totaling about $4 billion. It said it had hired law firm Sullivan & Cromwell to conduct an investigation into why the coding error in a computer model caused the products to be given a rating four notches higher than they merited.

**New York Attorney General Cuomo Scores an Early  Settlement**

166.    On June 5, 2008, the New York Attorney General, Mr. Cuomo, announced a

settlement with Moody's and other rating agencies. Mr. Cuomo's press release read in part:

ATTORNEY GENERAL CUOMO ANNOUNCES LANDMARK REFORM
AGREEMENTS WITH THE NATION'S THREE PRINCIPAL CREDIT
RATING AGENCIES

Standard & Poor's, Moody's, and Fitch Agree to Change Fee Structures, Obtain
Due Diligence Information for the First Time, and Create Due Diligence and
Lender Standards for Residential Mortgage-Backed Securities

NEW YORK, NY (June 5, 2008) - Attorney General Andrew M. Cuomo today
announced that he has reached landmark agreements with the nation's three
principal credit rating agencies that will fundamentally reform the Residential
Mortgage- Backed Securities ("RMBS") market. The agreements with Standard &
Poor's ("S&P") Moody's Investors Service, Inc. ("Moody's"), and Fitch, Inc.
("Fitch") will dramatically increase the independence of the ratings agencies,
ensure that crucial loan data is provided to the agencies before they rate loan
pools, and increase transparency in the RMBS market. Under the agreements with
Attorney General Cuomo, the credit rating agencies will fundamentally alter how
they are compensated by investment banks for providing ratings on loan pools. In
addition, the ratings firms will all now require for the first time that investment
banks provide due diligence data on loan pools for review prior to the issuance of
ratings. This will ensure that significant data, which was not previously disclosed
to the rating agencies, will be received and reviewed by them before any bonds
are rated. "The mortgage crisis currently facing this nation was caused in part by
misrepresentations and misunderstanding of the true value of mortgage securities.
The tremendous reach of this crisis cannot be understated -- our entire economy
continues to feel aftershocks from the collapse of the mortgage industry," said
Attorney General Cuomo. "By increasing the independence of the rating agencies,
ensuring they get adequate information to make their ratings, and increasing
industry-wide transparency, these reforms will address one of the central causes
of that collapse. The reforms agreed to today by S&P, Moody's, and Fitch should
begin to restore investor confidence during what is a very troubling time for the
mortgage industry, and I applaud the firms for their cooperation with our
investigation." Residential Mortgage-Backed Securities are bonds issued by large
financial institutions backed by pools of individual home mortgages. An
investigation by Attorney General Cuomo found that there were certain structural
issues in the RMBS market that needed to be reformed in order to help restore
investor confidence. These issues included that credit rating agencies were
typically only compensated by investment banks if they were selected by the
investment banks to provide an ultimate rating on a loan pool. The agencies were
paid no fees during their initial reviews of the loan pools or during their

> discussions and negotiations with the investment banks about the structuring of
> the loan pools. Investment banks were thus able to get free previews of RMBS
> assessments from multiple credit rating agencies, enabling the investment banks
> to hire the agency that provided the best rating. In addition, the Attorney
> General's investigation found that credit rating agencies were not privy to
> pertinent due diligence information that investment banks had about the
> mortgages comprising the loan pools.

The New York settlement deals in broad strokes with selected issues of independence and

analytical rigor affecting all of the major rating agencies.  It did nothing to remedy the massive

financial losses to Moody's caused by the Defendants, nor to address key board oversight

failures and internal controls at the Company.

**<u>Moody's Limited Internal Investigation Whitewashes the CPDO Cover Up</u>**

167.    On July 1, 2008, Defendants announced that the Company's "external

investigation" of the European CPDOs had revealed that members of a European CPDO

monitoring committee engaged in conduct contrary to Moody's Code of Professional Conduct.

Specifically, some committee members considered factors inappropriate to the rating process

when reviewing CPDO ratings following the discovery of the model error. According to

Moody's Code of Professional Conduct, a committee may consider only credit factors relevant to

the credit assessment and may not consider the potential impact on Moody's, or an issuer, an

investor or other market participant.

168.    As a result of these "findings," Defendants announced that Moody's had initiated

unspecified "employee disciplinary proceedings" with respect to unidentified individuals, and

had "accelerated measures to strengthen its rating and monitoring processes."

169.    Later that same day, Defendants announced that defendant Kirnon had "resigned"

"for lapses in ratings of the European CPDOs."  The Company did not comment on the

departure, and did not disclose the terms of defendant Kirnon's severance.

**SEC Probe Concludes Moody's and Its Competitors**
**Lacked Controls to Protect Integrity of Ratings**

170.    The SEC published the results of its examinations of Moody's and its competitors on July 8, 2008. The Commission identified glaring problems in all processes of the Company's ratings process, including issues of documentation, conflicts of interest, disclosure, adherence to models, policies and procedures, surveillance, and analyst participation in deal terms.  Among the Commission's findings were the following:

- Internal documents at two of the rating agencies [including Moody's] appear to reflect struggles to adopt to the increase in the volume and complexity of the [structured finance] deals.

- Rating agencies [including Moody's] made "out of model adjustments" and did not document the rationale for the adjustment.

- None of the rating agencies examined [including Moody's] had specific written procedures rating RMBS and CDOs.

- Rating agencies [including Moody's] do not appear to have specific policies and procedures to identify or address errors in their models or methodologies.

- The rationale for deviations from the model or out of model adjustments was not always documented in deal records [including at Moody's].

- There was also a lack of documentation of committee actions and decisions [including at Moody's].

- There was sometimes no documentation of committee attendees [including at Moody's].

- The surveillance processes  used by the rating agencies [including Moody's] appear to have been less robust than their initial ratings processes.

- While each rating agency has policies and procedures restricting analysts from participating in fee discussions with issuers, these policies still allowed key participants in the ratings process to participate in fee discussions.

- Analysts appeared to be aware, when rating an issuer, of the rating agency's business interest in securing the rating of the deal [including at Moody's].

- Rating agencies [including Moody's] do not appear to take steps to prevent considerations of market share and other business interests from the possibility that they could influence ratings or ratings criteria.

**Congress Convenes New Hearings, Reveals**
**Moody's Internal Documents, Grills Defendant McDaniel**

171.    The United States Congress convened new hearings on Defendants' misconduct on October 22, 2008. The proceedings were chaired by Representative Henry A. Waxman, Chair of the House Committee on Oversight and Government Reform.  In connection with these hearings, several internal documents were examined and revealed for the first time to the public. These documents included the September 2007 Town Hall transcript and McDaniel's October 2007 board presentation script.

172.    In his opening remarks for the hearings, Rep. Waxman stated: "The story of the credit rating agencies is a story of colossal failure. They broke a bond of trust... **and the result is that our entire financial system is now at risk."** (Emphasis added).  Rep. Waxman specifically predicted that the hearing testimony offered by McDaniel and others would contradict what the internal documents showed: "In their testimony today, the CEOs of Standard and Poor's Moody's, and Fitch will us that 'virtually no one . . . anticipated what is occurring.' **But the documents the Committee obtained tell a different story."** (Emphasis added).

173.    Indeed, as alleged above, the documents, including the September 2007 Town Hall transcript and defendant McDaniel's October 2007 board presentation script, show that Moody's management, including the Officer Defendants, were fully aware of the market-wide risks to permitting the degradation of Moody's ratings quality.

174.    As Rep. Waxman expected, defendant McDaniel's testimony was completely different from the story told by the internal documentary record.  The *Boston Globe* ably summarized the self-serving nature of the testimony by defendant McDaniel and his cohorts:

Deven Sharma of Standard & Poor's, Raymond McDaniel of Moody's Corp., and
Stephen Joynt of Fitch Inc. all raised their right hands in oath Wednesday. They
proceeded to tell the congressional committee they were caught off guard by the
financial disaster that unraveled. Otherwise, they pronounced themselves
completely innocent.

175.    One day later, Alan Greenspan, former Chairman of the Federal Reserve Bank,

told Congress that "[t]he . . . surge in global demand for U.S. subprime securities by banks,

hedge and pension funds, supported by unrealistically positive rating designations by credit

agencies was, in my judgment, **the core of the problem**." (Emphasis added).

176.    One message that came through clearly from the hearings was Defendants' utter

destruction of Moody's reputation.  Jerome Fons, former chair of the Company's Fundamental

Credit Committee, emphasized to Congress on October 22, 2008, the reputational capital that

Moody's has lost in Defendants' hands:

Moody's own reputation for independent, accurate ratings sprang from a
hardheaded culture of putting investors' interests first. This reputation helped
propagate the use of ratings in regulations and investment guidelines. Up until the
late 1960's, the firm often refused to meet with rated companies. Published
methodologies were all but non-existent and ratings were assigned by an
inaccessible, small group of analysts and managers. Even through the mid-1990s,
Moody's was considered the most difficult firm on Wall Street to deal with.

177.    Fons's written testimony for the October 2008 hearings provides a good overview

of some of the reasons Moody's ratings processes were systematically degraded:

Evidence of falling home values began to emerge in late 2006. Yet there was no
appreciable change in rating standards reflecting this reality. Market reaction
forced a halt to new securitizations in the summer of 2007; the first downgrades
of subprime linked securities occurred in June of 2007.

In turn, those institutions and structures that had purchased subprime RMBS
became hapless victims, many seeing declines in their own ratings, some of them
pushed to the brink of failure. As the pace of downgrades accelerated, market
participants began to question the reliability of ratings. In short order, faith in
credit ratings had diminished to the point where no financial institution was
willing to lend to another. And so we had – and are still having – a credit crisis.

Why did it take so long for the rating agencies to recognize the problem? Why were standards so low in the first place? And what should be done to see that this does not happen again?

My view is that a large part of the blame can be placed on the inherent conflicts of interest found in the issuer-pays business model and rating shopping by issuers of structured securities. A drive to maintain or expand market share made the rating agencies willing participants in this shopping spree. It was also relatively easy for the major banks to play the agencies off one another because of the opacity of the structured transactions and the high potential fees earned by the winning agency. Originators of structured securities typically chose the agency with the lowest standards, engendering a race to the bottom in terms of rating quality. While the methods used to rate structured securities have rightly come under fire, in my opinion, the business model prevented analysts from putting investor interests first.

* * * *

Following the 2000 "spin" from Dun & Bradstreet, in which Moody's became a stand-alone public company, management's focus increasingly turned to maximizing revenues. Stock options and other incentives raised the possibility of large payoffs. Managers who were considered good businessmen and women – not necessarily the best analysts – rose through the ranks. Ultimately, this focus on the bottom line contributed to an atmosphere in which the aforementioned rating shopping could flourish.

178.    During the October 2008 hearings, defendant McDaniel was confronted with the statements he had made in the September 2007 Town Hall and his October 2007 board presentation script, as well as his earlier public misrepresentations:

Chairman WAXMAN:

Mr. McDaniel, in 2003 you said, rating actions will reflect judicious considerations of all circumstances and that the system is not broken. In 2005 you said, "we believe we have successfully managed the conflicts of interest and have provided objective, independent and unbiased credit opinions."

These are the things that we are hearing from you in public over the years. But Mr. McDaniel, behind closed doors you were apparently more candid because on September 10, 2007, you had a private meeting with your managing directors. You called it a town hall meeting. And you said the purpose was to speak as candidly as possible about what is going on in the subprime market and our own business. And you told the gathering of senior executives that there are a number of messages that we just frankly didn't want to write down. But a transcript was

kept of that hearing, of that meeting, and we have obtained a copy of it. And this transcript has never been made public before. According to this transcript, this is what you told your managing directors and why, about why so many mistakes were made rating mortgage-backed securities. "Now, it was a slippery slope, what happened in '04 and '05 with respect to subordinated tranches is that our competition, Fitch and S&P, went nuts. Everything was investment grade. It didn't really matter. We tried to alert the market. We said we're not rating it. This stuff isn't investment grade. No one cared because the machine just kept going."

Mr. McDaniel, what did you mean when you said that Fitch and S&P went nuts and started rating everything as investment grade?

****

I'm trying to reconcile what you have said publicly on a number of occasions, including today, and what you said in a private meeting and it seems to me you are saying totally different things in public than you're saying in private. In public, you assure us that your industry meets the highest standards but in private, you're telling insiders that conditions in your industry could lead to a financial crisis.

Mr. MCDANIEL. I am saying both internally at Moody's and externally to the public, very consistently, that we seek to maintain the highest levels of objectivity, independence, and professionalism in assigning our ratings and I say that to both groups.

Chairman WAXMAN. I know that is what you're saying here, but it's hard to reconcile the transcript of that meeting.

Mrs. MALONEY:
On July 30th, rather, July 28th of 2003, you sent the SEC a letter opposing this regulation. In your letter, you claim that Moody's had dealt with "this conflict of interest. And I will read to you exactly what you said. You said, and I quote, lithe level of ratings are not affected by a commercial relationship with an issuer. II Do you remember sending this letter?

Mr. MCDANIEL. I do remember sending the letter. I don't remember the sentence, but yes, I remember sending the letter.

Mrs. MALONEY. In the letter, you made a very strong case that you had vigorous protections in place to prevent your ratings from being affected by your profits, and as a result of your categorical strong assertions, no regulations were adopted. My problem is that on October 23, 2007, you gave a presentation to your board of directors, which said absolutely the exact opposite of what you said publicly and to the SEC. And the committee has obtained a copy of that document. And in that, you described what you called, and I quote, a very tough problem. And under the heading conflict of interest, market share, you said, the

document says, "The real problem is not that the market underweights ratings
quality, but rather that in some sectors, it actually penalizes quality. It turns out
that ratings quality has surprisingly few friends. Issuers want high ratings.
Investors want ratings downgrades. Short sighted bankers want to gain the ratings
of the rating agencies. And you described in this document some of the steps that
Moody's has taken to square the circle." But then you said this, and I quote, "this
does not solve the problem." So would you like to comment on what you said in
this document, and you also said that keeping market share while maintaining
high quality, was an unsolved problem. Does this internal presentation to your
board contradict years of public statements to the public and to the SEC by you
and other Moody's officials? In public, you said conflicts of interest could be
managed. But in private, you said your internal procedures had not solved the
problem. And let me read you another passage. You also wrote this. And I quote.
"Unchecked competition on this basis can place the entire financial system at risk.
II To me, this is an astonishing, amazing statement. Especially in light of what is
occurring in the markets now and the pain and suffering of Americans and our
economy, what exactly did you mean when you said competition on this basis can
place the entire financial system at risk? And how can you sleep at night knowing
that these risky products that you were giving triple-A ratings could put the entire
financial system at risk?
Mr. MCDANIEL. First of all, I should restate the public comments that I have
made previously, which is that our ratings are not influenced by commercial
considerations. Our ratings are the basis of our best opinion based on the
available information at the time.

Mrs. MALONEY. But that is not what you said to your board members. That is
not what you said in this document.

For his part, defendant McDaniel stuck to the party line—that Moody's ratings are "not

influenced by commercial considerations.   However, as representatives Waxman and Maloney

observed, the internal documentary record speaks for itself, and tells a different story.

## REVELATION OF DEFENDANTS' DECEPTIVE
## REPRESENTATIONS DECIMATES THE COMPANY'S MARKET VALUE

179.     As demonstrated above, the Defendants' repeated public statements concerning

Moody's  independence, objectivity, and integrity, as well as statements concerning  the

inclusion of robust qualitative analysis of loan originator data in the Company's structured

finance ratings methodologies, were false.  Ratings quality was being systematically sacrificed in

the pursuit of short term profits, and the Officer Defendants knew it all along.    Their false

assurances of integrity artificially inflated the market price of Moody's common stock.

180.    When the falsehood was revealed over time in a series of disclosures and events,

Moody's stock lost billions of dollars in value.  On January 3, 2007, Moody's common stock

closed at a price of $70.32 per share.  By May 21, 2008, Moody's common stock closed at

$36.91.  This decline represents a loss of in excess of $7 billion in market value.

181.    Specific Moody's stock market price declines are  directly attributable to specific

events and disclosures that revealed the falsehood of Defendants' repeated assurances.  The

following disclosures and events were accompanied by significant downward stock price

movements:

(a)    On July 12, 2007, Moody's announced its first large wave of subprime
RMBS downgrades, which gave the market reason to believe that Moody's prior
ratings were materially inflated. Similarly, on July 24, 2007, Moody's issued a
report on subprime losses. As the market digested this news, Moody's share price
dropped from $66.80 on July 12, 2007 to $53.80 on July 31, 2007 – a loss of
nearly 20 percent of its value.

(b)    On August 10, 2007, there were a series of public reports detailing the
conflict of interest in Moody's structured finance business and suggesting that the
conflict might have caused inaccurate and inflated ratings by Moody's. On
August 20, 2007, Senator Richard Shelby, head of the U.S. Senate Banking
Committee, remarked that credit rating agencies such as Moody's must shoulder
some of the blame for the subprime mortgage crisis. Reports noted that Moody's
was facing Congressional scrutiny for "inherent" conflicts of interest in helping to
construct mortgage-backed securities and then issuing ratings on them. The share
price declined $3.90 that day, Moody's largest single-day decline in over a year.
Between August 10, 2007, and September 17, 2007, the share price declined from
$54.70 to $42.87 – another 20 percent drop in just a month and a half.

(c)    On April 11, 2008, when *The Wall Street Journal* reported that Moody's
had adjusted a bond rating in response to a threat by an issuer in a case of ratings
shopping, the Company's stock price dropped 2.4%.

(d)    On May 21, 2008, the market digested the Financial Times's report the
previous day of Defendants' manipulation and subsequent cover-up of the
European CPDO ratings process. When such concrete evidence was revealed,

Moody's share price spiked sharply downward, dropping from $43.90 on May 20, 2008, to $34.51 on May 22, 2008 – yet another 20 percent drop.

(e)    Finally, in late October 2008, as the market heard defendant McDaniel drilled by members of Congress and reviewed the incriminating internal documents showing Defendant' awareness and willful deception of investors, it lopped yet another 20 percent off of Moody's stock price – dropping it from $24.30 on October 21, 2008, to $19.29 on October 24, 2008. On October 22, 2008 alone, when internal documents revealed in connection with Defendant McDaniel's testimony strongly implied the Company's own analysts and managing directors were not independent from the Company's they rated, Moody's stock price dropped 6.1%.

182.    The drop in Moody's share price during the Relevant Period cannot be explained by reference to broader factors operative in the wider stock market or among comparable companies in the same industry. For example, during the Relevant Period (until October 24, 2008), the share price of Moody's declined 73 percent, while the S&P 500 Index declined only 36 percent. Moreover, for most of the Relevant Period, the S&P 500 Index outperformed Moody's by a substantially wider margin.

## MOODY'S STOCK REPURCHASE PROGRAM

183.    During the period 2006 through the first half of 2007, while the stock market price of Moody's common stock was inflated by Defendants false public assurances of integrity and robust credit analysis as detailed above, Defendants caused Moody's to expend over $2 billion to repurchase Moody's stock in the market at the inflated prices.  Moody's spent $1.1 billion during 2006 on such repurchases.  Defendants accelerated these repurchases in 2007, causing Moody's to expend another $943 million on such repurchases in the first half of 2007.

184.    At the end of July 2007, before the full depth and extent of wrongdoing at Moody's came to light, defendants McDaniel, Huber and McCabe persuaded the Defendant Directors to expand the stock buyback program by authorizing an additional $2 billion in repurchases.  To fund the additional buybacks, Defendants on October 2, 2007 announced plans

to float additional debt.  Ironically, Moody's normally takes a jaundiced view when corporations float debt to repurchase outstanding common stock:

> Although the credit rating company typically views raising debt to buy back stock as a negative for credit profiles of companies it rates, Moody's has stepped up its own stock buyback program and increased its debt levels this year.

*Financial Week*, "Issuing debt to fund a stock buyback, Moody's says 'Do as I say, not as I do'" (October 2, 2007).

185.    In the final 6 months of 2007, Defendants caused Moody's to expend another $795 million to repurchase Moody' common stock at still artificially inflated market prices.

186.    In the first quarter of 2008, prior to the May 2008 revelations of the CPDO cover-up (and the associated 20% decline in Moody's stock price), defendants caused Moody's to expend  $264.5 million to repurchase Moody' common stock at still artificially inflated market prices.

187.    Finally, in the second and third quarters of 2008, prior to the October 22 Congressional hearings (and the associated Moody's stock price decline, as alleged above) defendants caused Moody's to expend an additional $208.4 million to repurchase Moody' common stock at still artificially inflated market prices.

188.    Thus, even as the consequences of their systematic degradation of Moody's ratings processes began to manifest themselves, the Officer Defendants persuaded the Director Defendants to acquiesce in leveraging Moody's balance sheet to continue its ill conceived program of repurchasing inflated shares.  This repurchase program acted to lessen the downward price impact of the continuing revelations of management's wrongdoing.

## DEFENDANTS' INSIDER SELLING

189.    Since April 1, 2006, during the height of Defendants' debasement of the credit ratings process at Moody's, and before disclosure of Defendants' wrongdoing, as alleged herein, defendants McDaniel, Glauber, McGillicuddy, Clarkson, Huber, Dering, and McCabe (the "Insider Selling Defendants"), while in possession of material, non-public information regarding the Company's exposure to losses, settlements, and liability, sold approximately $12 million in Moody's stock on the basis of their inside information.

190.    Each of the Insider Selling Defendants sold stock in the amounts set forth herein.

191.    The sales by the Insider Selling Defendants constituted a breach of their fiduciary duties to the Company. In addition, it violated Moody's corporate policy as contained in the Company's Code of Professional Conduct, its Code of Business Conduct, and its Code of Ethics.

## RESULTANT HARM TO THE COMPANY

192.    As a result of Defendants' misconduct alleged herein:

(a)    The Company has been defrauded into expending $3.31 billion to repurchase Moody's common stock at prices artificially inflated by Defendants' material misrepresentations and omissions, resulting in hundreds of millions, if not billions, of dollars in damages to the Company;

(b)    The Insider Selling Defendants have avoided millions of dollars in losses through their sales of Company stock based on material nonpublic information, which avoided losses constitute funds to which the Company is entitled to receive from the Insider Selling Defendants, but which have been withheld from the Company;

(c)    The Company has suffered billions of dollars in damages as a result of loss of its reputation for integrity, independence, objectivity, and rigorous, reliable credit ratings

(d)    The Company has suffered as yet unquantified damages, likely in the hundreds of millions if not billions of dollars, in liabilities to purchasers of the Company's securities.

(e)       The Company has suffered as yet unquantified damages, likely in the hundreds of millions if not billions of dollars,  in liabilities to investors in securities rated by the Company.

(f)       The Company has suffered millions of dollars in damages in the form of costs to defend the Company in connection with governmental investigations and litigation resulting from Defendants' misconduct; and

(g)       The Company has suffered substantial damages in the form of increased costs of capital resulting from Defendants' misconduct.

## RULE 23.1 DERIVATIVE ALLEGATIONS

193.    Plaintiff brings this action derivatively on behalf of Moody's.

194.    Plaintiff is a stockholder of Moody's and has been a stockholder of Moody's at all times relevant to the allegations set forth herein.

195.    Plaintiff has retained counsel experienced in litigation of this nature and will adequately represent the interests of Moody's.

196.    This action is not brought collusively to create jurisdiction that would not otherwise exist.

197.    Prior to bringing this action, Plaintiff made a demand for remedial action on the Moody's Board of Directors, including demand that the Moody's Board cause Moody's to commence litigation to recover damages from those responsible for the wrongdoing described herein.  Plaintiff's demands were made by letter dated November 3, 2008 from his counsel to the Moody's Board (the "Demand Letter'). A copy of the Demand Letter is attached hereto as Exhibit "A."

198.    In the eight months since November 2008, the Moody's Board has not even commenced an investigation into, or even any independent review of, the matters set forth in the Demand Letter, let alone commenced the litigation demanded by plaintiff.  The Moody's Board

has instead abdicated its responsibilities to investigate and preserve the Company's claims against those responsible for the wrongdoing and resulting harms to it as alleged herein.

199.    Thus, for all intents and purposes, the Moody's Board of Directors has refused to take the demanded actions in response to the Demand Letter.

200.    This refusal to act is wrongful, in that the refusal is not the product of an independent, good faith and reasonable investigation of the matters set forth in the Demand Letter, and is not the product of a reasonably informed decision that refusal to act is in the best interests of the Company.

201.    Accordingly, plaintiff has no adequate remedy at law and is forced to bring this equitable action in the right of the Company to protect its interests and those of its shareholders.

**COUNT I**
**(Derivatively Against Defendants for Violation of § 10(b)**
**of the Exchange Act and Rule 10b-5 Promulgated Thereunder)**

202.    Plaintiff incorporates by reference each of the foregoing allegations.

203.    Throughout the Relevant Period, the Officer Defendants, by the use of means or instrumentalities of interstate commerce, the United States mails, interstate telephone communications, and a national securities exchange, employed a device, scheme, or artifice to defraud, made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Company and shareholders in connection with their purchases of Moody's common stock during the Relevant Period, all in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

204.    The Officer Defendants, as the most senior of Moody's during the Relevant Period, are liable as direct participants in all of the wrongs complained of herein. Through their positions of control and authority, Officer Defendants were in a position to and did control all of the false and misleading statements and omissions made on behalf of the Company, including the contents of all its public filings and reports and press releases, as more particularly set forth above. As such, they were collectively control persons of the Company under and pursuant to Section 20 of the Exchange Act. In addition, certain of these false and misleading statements constitute "group published information," which the Officer Defendants were responsible for creating.

205.    The Officer Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them and they had express responsibility for knowing such facts. Such material misrepresentations and omissions were made knowingly or recklessly and for the purpose and effect of concealing the Company's true financial and operating condition from shareholders and supporting an artificially inflated price of the Company's common stock.

206.    The Officer Defendants had the motive and opportunity to commit fraud. By virtue of their positions of control over the Company, the Officer Defendants had unquestioned opportunity to issue statements that they knew were false and misleading. Each of the Officer Defendants had direct operative control over the Company's practices in the credit rating process. Each of the Officer Defendants had the motive to mislead investors,  because, among other things:  (a) During the Relevant Period, each of the Officer Defendants wanted to paint a picture of Moody's as being as profitable as possible so as to ensure the maximum possible

bonus and other performance-based compensation for the fiscal year; accordingly, each of these

Defendants was motivated to conceal the Company's true exposure to harm from their

destruction of the integrity of the credit rating process at the Company; (b) In particular, each of

the Officer Defendants received significant compensation including a program of bonuses when

Moody's reached certain financial and earnings targets. The target bonuses rewarded executives

on a variety of factors, including the size of the Company's revenues from credit ratings given to

structured finance securities. The Officer Defendants, therefore, understood that announcing that

Moody's stood to lose billions of dollars from revelation that the credit rating process at

Moody's had been destroyed at their hands, and that the Company had manipulated the market to

deceive its own customers on that topic, would directly and negatively impact their bonuses; (c)

Officer Defendants further benefited from high stock prices for Moody's when they sold the

stock they received through stock, option, and other awards. If the Officer Defendants had

caused the Company to report losses in a timely manner, the stock price would have fallen and

the amount of money Defendants received from their stock price correspondingly would have

decreased by 65 percent or more; (d) In addition, each of the Officer Defendants, by virtue of

being a shareholder of Moody's, was motivated to conceal the Company's exposure to losses and

other liabilities in connection with their destruction of the credit rating process so as to maintain

an artificially high price for the Company's stock; (e) Officer Defendants were motivated to

overstate Moody's financial results, and keep its stock price high, so as to protect their positions

of power, authority, prestige, and personal remuneration at the Company, including out-sized

salaries, stock awards, and other emoluments worth multiple millions of dollars; and (f) Offcier

Defendants, as a result of repeated warnings from within and without the Company, were on

notice no later than July 2007 that their practices in managing the credit rating process at

Moody's were fraudulent and manipulative, yet did not take steps to change them, preferring instead to retain the profits from such illegal market manipulation.

207.    Defendants McDaniel and Huber signed certifications to various Forms 10-Q and 10-K filed publicly with the SEC during the Relevant Period, attesting that they had reviewed the reports and based on their knowledge, there were no untrue statements of material fact or omissions of material fact necessary to make the statement made, in light of the circumstances under which the statements were made, not misleading.

208.    The Director Defendants are likewise liable, in that they exercised control over the issuance of the false and misleading statements detailed herein, particularly in view of their responsibilities as Audit Committee members, and they were reckless with respect to the truth or falsity of the misrepresentations alleged herein.

209.    The Company repurchased shares of its common stock during the Relevant Period, expending $3.3 billion to purchase Company common stock at market prices inflated by Defendants misrepresentations. In purchasing its stock, the Company or its shareholders relied upon the Defendants' statements and/or the integrity of the market in making their purchases. Moody's common stock trades on the New York Stock Exchange in an efficient market, and the Company relied upon the integrity of the market price for its stock, in that it would not have made the repurchases had it been aware that the market price of the stock was artificially inflated.

210.    Accordingly, Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated by the SEC thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made,

not misleading; and/or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Moody's and others in connection with their purchases of Moody's common stock during the Relevant Period.

211.    As a result of Defendants' misconduct, Moody's has suffered and will suffer damages in that it paid artificially inflated prices for Moody's common stock purchased on the open market. Moody's would not have purchased Moody's common stock at the prices it paid had the market price of Moody's stock not been artificially and falsely inflated by Defendants' misleading statements. Moody's suffered harm when the inflated market price of its stock fell in response to the corrective disclosures alleged herein.  As a direct and proximate result of Defendants' wrongful conduct, Moody's suffered damages in connection with its purchases of Moody's common stock during the Relevant Period.  By reason of such conduct, Defendants are liable to the Company.

212.    Plaintiff on behalf of Moody's has no adequate remedy at law.

## COUNT II
**(Derivatively Against Defendants for Contribution for Violation of § 10(b)of the Exchange Act and Rule 10b-5 Promulgated Thereunder)**

213.    Plaintiff incorporates by reference each of the foregoing allegations.

214.    Throughout the Relevant Period, Officer Defendants, by the use of means or instrumentalities of interstate commerce, the United States mails, interstate telephone communications, and a national securities exchange, employed a device, scheme, or artifice to defraud, made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Company and shareholders in connection with their purchases of Moody's

common stock during the Relevant Period, all in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

215.    The Officer Defendants, as the most senior of Moody's during the Relevant Period, are liable as direct participants in all of the wrongs complained of herein. Through their positions of control and authority, the Officer Defendants were in a position to and did control all of the false and misleading statements and omissions made on behalf of the Company, including the contents of all its public filings and reports and press releases, as more particularly set forth above. In addition, certain of these false and misleading statements constitute "group published information," which the Officer Defendants were responsible for creating.

216.    The Officer Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them and they had express responsibility for knowing such facts. Such material misrepresentations and omissions were made knowingly or recklessly and for the purpose and effect of concealing the Company's true financial and operating condition from shareholders and supporting an artificially inflated price of the Company's common stock.

217.    The Officer Defendants had the motive and opportunity to commit fraud. By virtue of their positions of control over the Company, the Officer Defendants had unquestioned opportunity to issue statements that they knew were false and misleading. Each of the Officer Defendants had direct operative control over the Company's practices in the credit rating process. Each of the Officer Defendants had the motive to mislead investors, because, among other things:  (a) During the Relevant Period, each of the Officer Defendants wanted to paint a picture of Moody's as being as profitable as possible so as to ensure the maximum possible

bonus and other performance-based compensation for the fiscal year; accordingly, each of these

Defendants was motivated to conceal the Company's true exposure to harm from their

destruction of the integrity of the credit rating process at the Company; (b) In particular, each of

the Officer Defendants received significant compensation including a program of bonuses when

Moody's reached certain financial and earnings targets. The target bonuses rewarded executives

on a variety of factors, including the size of the Company's revenues from credit ratings given to

structured finance securities. The Officer Defendants, therefore, understood that announcing that

Moody's stood to lose billions of dollars from revelation that the credit rating process at

Moody's had been destroyed at their hands, and that the Company had manipulated the market to

deceive its own customers on that topic, would directly and negatively impact their bonuses; (c)

the Officer Defendants further benefited from high stock prices for Moody's when they sold the

stock they received through stock, option, and other awards. If the Officer Defendants had

caused the Company to report losses in a timely manner, the stock price would have fallen and

the amount of money Defendants received from their stock price correspondingly would have

decreased by 65 percent or more; (d) In addition, each of the Officer Defendants, by virtue of

being a shareholder of Moody's, was motivated to conceal the Company's exposure to losses and

other liabilities in connection with their destruction of the credit rating process so as to maintain

an artificially high price for the Company's stock; (e) the Officer Defendants were motivated to

overstate Moody's financial results, and keep its stock price high, so as to protect their positions

of power, authority, prestige, and personal remuneration at the Company, including out-sized

salaries, stock awards, and other emoluments worth multiple millions of dollars; and (f) the

Officer Defendants, as a result of repeated warnings from within and without the Company, were

on notice no later than July 2007 that their practices in managing the credit rating process at

Moody's were fraudulent and manipulative, yet did not take steps to change them, preferring instead to retain the profits from such illegal market manipulation.

218.    Defendants McDaniel and Huber signed certifications to various Forms 10-Q and 10-K filed publicly with the SEC during the Relevant Period, attesting that they had reviewed the reports and based on their knowledge, there were no untrue statements of material fact or omissions of material fact necessary to make the statement made, in light of the circumstances under which the statements were made, not misleading.

219.    The Director Defendants are likewise liable, in that they exercised control over the issuance of the false and misleading statements detailed herein, particularly in view of their responsibilities as Audit Committee members, and they were reckless with respect to the truth or falsity of the misrepresentations alleged herein.

220.    To the extent that the Company is held liable to purchasers of the Company's stock for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, it is entitled to claim, and hereby does claim, contribution against each of the Defendants herein.   Federal law provides Moody's with a cause of action for contribution against other alleged joint tortfeasors under Rule 10b-5.   In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, Moody's has a federal law right of contribution against joint tortfeasors under Rule 10b-5.  Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling Moody's to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending class actions, and sets forth specific rules regarding the determination of claims for such contribution.

221.    Plaintiff does not in this Count assert that Moody's has any right to indemnification from Defendants, but rather only claims contribution.

222.    Plaintiff on behalf of Moody's has no adequate remedy at law.

**COUNT III**
**(Derivatively Against Defendants For Violation Of**
**Section 14(a) Of The Securities Exchange Act And Rule 14a-9)**

223.    Plaintiff incorporates by reference each of the foregoing allegations.

224.    On March 22, 2006, Defendants caused Moody's to issue a proxy statement to solicit votes to, among other things, re-elect defendants Kist, McKinnell, and Wulff to the Board, and to persuade shareholders to vote against a shareholder proposal to declassify the Board of Directors, i.e., to require annual elections.

225.    On March 21, 2007, Defendants caused Moody's to issue a proxy statement to solicit votes to, among other things, re-elect defendants Anderson and McDaniel to the Board, to approve amendments to the Amended and Restated 2001 Moody's Corporation Key Employees' Stock Incentive Plan, and to persuade shareholders to vote against a shareholder proposal to declassify the Board of Directors, i.e., to require annual elections.

226.    On March 19, 2008, Defendants caused Moody's to issue a proxy statement to solicit votes to, among other things, re-elect defendants Glauber, McGillicuddy, and Newcomb to the Board, to approve the Amended and Restated 2001 Moody's Corporation Key Employees' Stock Incentive Plan, and to persuade shareholders to vote against a shareholder proposal to remove supermajority voting provisions from the Company's  Certificate of Incorporation and By-Laws.

227.    Each of the proxy statements referred to in the preceding three paragraphs were materially false and misleading, in that each of them (i) failed to disclose in non-perjorative

terms that previous public statements that Defendants caused to be made by or on behalf of the Company, regarding the integrity, independence, objectivity, and substantive rigor of the Company's structured finance ratings processes were false and misleading, as alleged herein, and (ii) affirmatively represented that the Company's Board of Directors had adopted policies and procedures to assure appropriate Board oversight of internal controls and compliance and that the Company had adopted a Code of Business Conduct and Ethics, thus adding to the previous false statements concerning integrity, without disclosing the falsehood of the earlier statements.

228.    The Defendants either knew that the 2006 through 2008 proxy statements were false and misleading, were reckless with respect to their truth or falsity, or were negligent with respect to their truth or falsity.

229.    As a result, (i) each of the Director Defendants were improperly elected to the Moody's Board, and (ii) amendments to the Amended and Restated 2001 Moody's Corporation Key Employees' Stock Incentive Plan were improperly approved.

230.    Additionally, as a result, the Company has been harmed to the extent of compensation granted under the improperly approved amendments to the Amended and Restated 2001 Moody's Corporation Key Employees' Stock Incentive Plan.

231.    Plaintiff on behalf of Moody's has no adequate remedy at law.

**COUNT IV**
**(Derivatively Against the Insider Seller Defendants**
** for Breach of Fiduciary Duty)**

232.    Plaintiff incorporates by reference each of the foregoing allegations.

233.    As alleged herein, each of defendants McDaniel, Glauber, McGillicuddy, Clarkson,  Huber, Dering, and McCabe (the "Insider Selling Defendants"), while in possession of material, non-public information regarding the falsehood of  public assurances of the integrity,

independence, objectivity and substantive rigor of the Company's structured finance ratings, and regarding Company's exposure to losses, settlements, and liability, sold approximately $12 million in Moody's stock on the basis of their inside information.

234.    Each of the Insider Seller Defendants owes to the Company fiduciary duties of good faith, loyalty, and care, including the duty not to use material non-public information of the Company for personal advantage, and the duty to refrain from purchasing or selling Company stock based on such material non-public information.

235.    When the market became aware of the falsehood of  such public assurances of the integrity, independence, objectivity and substantive rigor of the Company's structured finance ratings, through several specific events and disclosures as alleged herein, the market price of the Company's common stock fell substantially.

236.    Because each of the Insider Seller Defendants sold Company stock based on such material non-public Company information, the Company is entitled to disgorgement from them in an amount equal to the losses they avoided through such sales.

237.    Plaintiff on behalf of Moody's has no adequate remedy at law.

### COUNT V
### (Derivatively Against the Officer Defendants
### for Breach of Fiduciary Duty)

238.    Plaintiff incorporates by reference each of the foregoing allegations.

239.    Each of the Officer Defendants owes fiduciary duties of loyalty and care to the Company.  Their duties of loyalty require them to expend their best efforts in pursuit of the best interests of the Company within the scope of their official authority.  Their duties of care require them to exercise that degree of care and prudence as would a reasonable person acting in pursuit of the Company's best interests under the circumstances at hand.

240.    As alleged herein, the Officer Defendants, in breach of their duties of loyalty and care to the Company, knowingly pursued a course of action directed toward achieving short term financial results and corresponding personal enrichment, which course of action involved deliberately degrading and debasing the integrity of the Company's credit ratings processes in the pursuit of structured finance ratings market share.  The Officer defendants knew that this course of action would harm the Company's reputation, which they knew to be its most fundamental and crucial asset.  The Officer defendants also knew that this course of action was placing not only the Company at risk, but also the entire financial system. Moreover, the Officer Defendants were aware not later than 2006 that conditions in the subprime mortgage market involved an extreme degree of risk and were "ripe for some type of financial event."  Despite this knowledge, the Officer Defendants continued to deliberately degrade and debase the integrity of the Company's credit ratings processes in the pursuit of structured finance ratings market share throughout the time period from July 2004 until mid 2007.

241.    Additionally, in breach of their duties of loyalty and care, the Officer Defendants engaged in an knowing and deliberate campaign of public deception, issuing repeated public assurances of the integrity, independence, objectivity and substantive rigor of Moody's structured finance ratings processes, thus actively concealing from regulatory, public and market view their deliberate degradation and debasement of the integrity of such ratings processes.  This campaign of active concealment included a cover up of errors in rating CPDO's, as alleged herein.  In fact, this campaign of deliberate concealment and denial continues to the present time, in the form of public denials of wrongdoing typified by defendant McDaniel's October 2008 testimony before Congress, although the collapse of the worldwide credit markets following

mass ratings downgrades, a worldwide recession, and the Company's internal contemporaneous documents belie the falsity of such denials.

242.    The Officer Defendants' deliberate degradation and debasement of the integrity of the Company's structured finance ratings processes, together with their campaign of public misinformation and concealment, has resulted in massive harm to the Company's reputation, manifested in the loss of billions of dollars worth of market capitalization, and substantial damages, in the form of costs and liabilities to investors and third parties, as well as increased costs of capital, as alleged herein.  The Officer Defendants' breaches of their fiduciary duties of loyalty and care are the proximate cause of all of these harms, and the Officer Defendants are fully accountable in damages for such breaches and the harms caused thereby.

243.    Plaintiff on behalf of Moody's has no adequate remedy at law.

## COUNT VI
### (Derivatively Against the Director Defendants for Breach of Fiduciary Duty)

244.    Plaintiff incorporates by reference each of the foregoing allegations

245.    Each of the Director Defendants owes fiduciary duties of loyalty and care to the Company.  Their duties of loyalty require them to expend their best efforts in pursuit of the best interests of the Company.  Their duties of care require them to exercise that degree of care and prudence as would a reasonable person acting in pursuit of the Company's best interests under the circumstances at hand.  The Director Defendants had a fundamental duty to exercise good faith and due care in the oversight and management of the business and affairs of Moody's.  These duties included the duty to maintain systems of information and reporting designed to effectively bring to their attention the information necessary for them to oversee management's

assessment and management of risks that are material to the business of the Company. These

duties also included the duty to actually monitor such systems of information and reporting.

246.    The events that have transpired, as alleged herein, demonstrate that the Director

Defendants  breached their duty of good faith in that they knowingly

(a)      Failed entirely to ensure that the Company had in place a system of
information and reporting designed to bring important matters of internal control,
compliance, and risk management to their attention on a timely basis; or

(b)      Having ensured that such system of information and reporting existed,
knowingly failed to monitor it.
The Director Defendants thus permitted management to utterly destroy the Company's

reputation, recognized by all to be its most important asset, and to pursue a ruinous course in the

management of the largest and fastest growing part of its core credit ratings business.

247.    As the proximate result of such breach of the Director Defendants duty of loyalty

(including good faith), the Company has suffered the damages alleged herein, none of which

would have occurred had the Director Defendants properly and in good faith attended to their

fundamental oversight duties.

248.    Plaintiff on behalf of Moody's has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that the Court enter judgment against the Defendants:

A.      declaring that each of the Defendants has breached his or her fiduciary and other

duties owed to Moody's and its shareholders as alleged herein;

B.      directing the Defendants, jointly and severally, to account for all losses and

damages sustained by Moody's caused by reason of the acts and omissions complained of herein;

C.      awarding Moody's money damages against all defendants, jointly and severally, for all losses and damages sustained and to be sustained by the Company and its shareholders as a result of the acts, omissions and transactions complained of herein;

D.      directing the Individual Defendants to account for and to remit and disgorge to Moody's all profits and other benefits and unjust enrichment they have obtained and retained as a result of the acts and omissions complained of herein;

E.      ordering the Company to take all necessary actions to reform and improve its corporate governance, compliance and internal control procedures for the purpose not only of preventing a recurrence of the failures detailed above, but to optimize such procedures in light of relevant and current best practices including, *inter alia*, establishing and implementing effective and consistently high standards for this issuance of ratings of the securities of client companies

F.      awarding Moody's pre-judgment and post-judgment interest as allowed by law;

G       awarding plaintiff's attorneys' fees, expert fees, consultant fees and other costs and expenses; and

H.      granting such other and further relief as the Court may deem just and proper.

### **JURY TRIAL DEMANDED**

Plaintiff demands a jury trial as to all issues so triable.

July 1, 2009                            GREENFIELD & GOODMAN, LLC
                                       By:   /s/ Richard D. Greenfield
                                       RICHARD D. GREENFIELD (RG 4046)
                                       MARGUERITE R. GOODMAN
                                       250 Hudson Street-8th Floor
                                       New York, NY 10013
                                       (917) 495-4446

                                       Counsel for Plaintiff

## VERIFICATION

I, W. A. SOKOLOWSKI, hereby declare and verify, as follows:

I am the plaintiff in the above-captioned case. I have read the contents of the foregoing Complaint. I am informed and believe the matters related therein are true, based upon facts as related to me by my counsel, and on that ground I allege that the matters stated therein are true.

W. A. SOKOLOWSKI

# EXHIBIT "A"

**GREENFIELD & GOODMAN LLC**
ATTORNEYS AT LAW
**250 Hudson Street**
**8th Floor**
**New York, NY 10013-1413**
**(410) 320-5931**
**Fax (410) 822-5129**

**email: whitehatrdg@earthlink.net**

**Richard D. Greenfield**
*Also admitted to the Maryland*
*and Pennsylvania Bars*

November 3, 2008

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Board of Directors
c/o Raymond W. McDaniel, Jr.,
Chairman and Chief Executive Officer
Moody's Corporation
7 World Trade Center at 250 Greenwich Street,
New York, New York 10007

**Re:   Shareholder Demand for Remedial Action**

Dear Members of the Board:

   We represent William Sokolowski (the "Stockholder"), a holder of shares of Moody's Corporation ("Moody's" or the "Company") at relevant times.  The purpose of this letter is to demand that you take action to remedy serious harm caused to the Company.  The harm at issue, its apparent causes, and the specific remedial actions demanded are described herein.

   Press reports, government investigations, testimony before Congress, and recent revelations have disclosed egregious

1

mismanagement and breaches of fiduciary duty by Company officers and directors as well as others presently unknown in connection with credit ratings delivered by Moody's to arrangers and underwriters of mortgage-related securities.

According to an April 27, 2008 article in *The New York Times*, Moody's—together with its two principal competitors, S&P and Fitch—is "a central culprit in the mortgage bust, in which the total loss has been projected at $250 billion and possibly much more." This article goes on to explain: "Last year, Moody's had to downgrade more than 5,000 mortgage securities—a tacit acknowledgment that the mortgage bubble was abetted by its overly generous ratings." Unjustifiably relaxing its standards to gain market share, Moody's had delivered thousands of credit ratings on mortgage-backed bonds and structured investment pools that purchase them—CDOs—ratings that were expected to be relied upon, and were relied upon, by investors in the rated securities, including banks, pension funds, mutual funds, hedge funds and other investors. After Moody's belatedly changed its ratings assumptions and downgraded mortgage-related securities it had previously rated as "triple A;" i.e. safe, these securities plummeted in value, forcing investors to take massive writedowns on them, and triggering the chain reaction that continues even now to spread, affecting not only the United States financial markets but markets throughout the world.

As a result of these breaches of duty by management and the Company's Board of Directors, Moody's has suffered billions of dollars in damages, and stands exposed to billions in liabilities to Moody's securities purchasers and to market participants who relied on its credit ratings.

Senior management and the Board (and others presently unknown) were acutely aware that pursuit of market share by relaxing ratings standards was a reckless and high-risk endeavor. In fact, in an October 21, 2007 internal memo authored for the Board by Moody's CEO Raymond McDaniel (and disclosed in connection with the October 22, 2008 Congressional hearings on "Credit Rating Agencies and the Financial Crisis")(the "McDaniel Memo"), McDaniel acknowledged that

"Moody's for years has struggled with this dilemma. On the one hand, we need to win the business and maintain market share, or we cease to be relevant. On the other hand, our reputation depends on maintaining ratings quality (or at least avoiding big visible mistakes)." The members of the Board and senior management were also acutely aware that this dilemma threatened harm not only to Moody's shareholders, but to the entire financial system. The McDaniel Memo acknowledged that competition with Standard & Poor's ("S&P") and Fitch on the basis of finding the lowest credit enhancement needed for the highest rating "can place the entire financial system at risk." Yet Moody's directors and senior management failed to implement controls to address these risks.

Despite knowledge that Moody's credit ratings business model was based on an inherent conflict of interest—its main source of revenue came from fees paid by the investment banks that arranged, underwrote or issued the securities the Company was rating—the Moody's Board allowed management to aggressively pursue market share in structured finance ratings since at least 2000. That is when, according to a May 8, 2008 article in *The Wall Street Journal*, former Moody's president Brian Clarkson "overhauled the residential mortgage team and ushered in a new methodology that led to higher ratings for some mortgage bonds and more market share for Moody's in the area." Then, in 2004, responding to Moody's falling market share in CDO ratings, Moody's Managing Director Gary Witt introduced a new CDO rating method that eliminated a penalty for asset concentration; this change reversed the market share decline. (*Bloomberg News*, September 27, 2008, "Moody's, S&P eased rules for more profits").

Throughout this period, the Board and senior management intentionally did nothing to mitigate the risks posed to Moody's and the global financial system by the Company's "race to the bottom" competition for structured finance ratings business. The McDaniel Memo explained: "For the most part, we hand the dilemma off to the team MDs to solve. As head of corporate ratings, I offered my managers precious few suggestions on how to address this very tough problem, just assumed that they would strike an appropriate balance." In other words, the Company's senior management and Board left it to line

management, without guidance, to deal with this "very tough problem." Line management's apparent response was predictable. These managers, whose compensation was based on "production," pushed the limits to gain and maintain market share. They permitted issuers to "shop" for ratings by paying the rating fee only after receiving an acceptably high credit rating, and also provided advice to issuers on how to tweak credit enhancement structures to meet the Company's minimum ratings criteria. Thus, Moody's was rating securities in which Moody's itself had played a role—if not the central role from a credit quality standpoint—in designing.

These practices continued despite the Company's recently admitted awareness that from 2003 forward, there was a material deterioration in mortgage origination standards and inflated housing prices. In his October 22, 2008 testimony before the United States House of Representatives Committee on Oversight and Government Reform, Mr. McDaniel stated that Moody's was aware of, and in fact published warnings about, deterioration in origination standards and inflated housing prices beginning in July 2003 and continued to publish such warnings "throughout 2004, 2005, and 2006." According to *The New York Times*, in a report published in May 2006, Mark Zandi, Moody's Chief Economist,

> noted that consumer borrowing had soared, household debt was at a record and a fifth of such debt was classified as subprime. At the same time, loan officers were loosening underwriting standards and easing rates to offer still more loans. Zandi fretted about the "razor-thin" level of homeowners' equity, the avalanche of teaser mortgages and the $750 billion of mortgages he judged to be at risk. Zandi concluded, *"The environment feels increasingly ripe for some type of financial event."*

(*New York Times*, April 27, 2008)(emphasis added). Additionally, in January 2007, Moody's published a special report highlighting rising defaults on 2006 vintage subprime mortgages. Yet senior management of Moody's continued, until April 2007, to rely on the Company's standard credit rating model, based on historical default rates and

4

assumptions that housing prices would continue to rise.    Moody's then announced that it was "revising the model it used to evaluate subprime mortgages," which had been introduced in 2002, because "[s]ince then, the mortgage market has evolved considerably." As *The New York Times* adroitly commented, "This was a rather stunning admission; [Moody's] model had been based on a world that no longer existed." (*New York Times,* April 27, 2008). It had, however, served Moody's management's drive for structured finance market share: by 2006, Moody's had pulled alongside its largest competitor, S&P; Moody's credit ratings market share reached 40%, compared to S&P's 41 to 42%. (See *Forbes.Com*, August 14, 2007, "Credit Crisis Hurts Rating Agencies;" *Bloomberg News*, September 27, 2008, "Moody's, S&P eased rules for more profits").

Finally, on July 10, 2007, Moody's applied its new model to slash the triple-A ratings it had previously granted to billions of dollars worth of subprime-backed securities issued in 2006. It did so due to increasing delinquencies and foreclosures on the underlying mortgages— circumstances of which it had been aware since at least January 2007, when it issued its special report. The July 10 downgrades were only the beginning.

By December 2007, Moody's had downgraded "more than half the 2006 subprime residential-mortgage-backed securities it had rated, including a whopping 97% of the slices, or tranches, it deemed single-A or below." (*Barron's Online*, December 24, 2007.

All told, Moody's has downgraded over 5,000 previously issued ratings on mortgage-related bonds and CDOs.

These ratings cuts have forced sell-offs of the securities, and triggered the massive wave of balance sheet write downs that have toppled major investment banks Bear Stearns and Lehman Brothers, forced the sales of Merrill Lynch, Wachovia and  Washington Mutual, dried up credit markets and sent the global securities markets into a tailspin.

As a result of its central role in the current global financial crisis, Moody's (and its competing credit agencies) have been the subject of SEC and state law enforcement investigations. The SEC concluded in a July 2008 Report that Moody's and S&P "violated internal procedures and improperly managed the conflicts of interest inherent in providing credits ratings to the banks that paid them." (*Bloomberg News,* September 27, 2008, "Moody's, S&P eased rules for more profits"). New York Attorney General Andrew Cuomo's investigation forced a settlement in which Moody's and its competitors agreed to reform numerous practices, including (i) adopting a fee structure that will force issuers to pay for services even if they dislike the result, (ii) disclosure rules that will reveal to the market whether issuers had decided not to use a rating that they sought, but then did not like, and (iii) requiring investment banks to provide due diligence data on loan pools for review prior to issuance of a rating. The Connecticut Attorney General's Office has commenced an antitrust investigation against the Company. As of August 2008, Moody's reported that it has "received subpoenas and inquiries from states attorneys general and other governmental authorities and is cooperating with such investigations and inquiries."

The oversight failures of the Board of Directors and senior executive officers of Moody's were poignantly brought into sharp focus by reports of a cover-up of erroneous credit ratings delivered to promoters of mortgage backed securities known as constant proportion debt obligations—a cover-up that itself severely damaged the Company and its shareholders. On May 20, 2008 the *Financial Times* reported that Moody's had awarded incorrect triple-A ratings to billions of dollars worth of a type of complex debt product due to a bug in its computer models. According to the *Financial Times,* internal Moody's "documents . . . show that some senior staff within the credit agency knew early in 2007 that products rated the previous year had received top-notch triple A ratings and that, after a computer coding error was corrected, their ratings should have been up to four notches lower." (emphasis added).

Yet despite discovery of the erroneous ratings in early 2007, Moody's improperly allowed the products to maintain their triple-A

status until January of this year when, amid general market declines, Moody's downgraded them several notches. In response to revelation of the cover-up, Moody's stock price declined 23.8% from $45.31 on May 20, 2008 to close at $34.51 on May 22, 2008, a loss in equity market capitalization of $2.64 billion. In July 2008, Moody's reported that fact-gathering by Sullivan & Cromwell "found that some members of a European CPDO monitoring committee considered factors inappropriate to the rating process when reviewing CPDO ratings following the discovery of a model error." (*CFO.com*, July 1, 2008, "Moody's Derivative Probe Prompts Changes"). This was a muted way of saying that Moody's concealed the error because management thought it could avoid the reputational damage that a "big visible mistake" would cause by waiting until the ratings could be adjusted for other reasons. Moody's admitted to the SEC that its ratings committee had been "aware that the ratings were higher than they should have been," but that the committee "agreed to continue to maintain the rating for several months, until the securities were downgraded for other reasons," due to the committee's concern for Moody's "*reputational interest in not making its error public.*" (SEC July 2008 report, page 26)(emphasis added). This cover-up—which cost the Company nearly $2.5 billion in value, should have been prevented by proper Board and senior management oversight.

Indeed, in its annual proxy statements, management has repeatedly assured the Company's shareholders that the Board's Audit Committee "represents and assists the Board of Directors in its oversight responsibilities relating to . . . compliance with legal and regulatory requirements [and] the Company's internal controls," and the Audit Committee's charter represents that the Committee exercises oversight over compliance and risk management matters.

Failure to prevent the constant proportion debt obligations ratings cover up is utterly inconsistent with these assurances. Instead, it reveals an utter failure to foster a culture of ethical business conduct, an apparent lack of independent management level compliance and risk management controls and appropriate board level reporting systems that had become standards of best practice not later than 2003, and a

7

complete disregard for the welfare of those who rely on Moody's ratings.

These failures lie at the root not only of the constant proportion debt obligation rating cover-up, but of the entire pattern of improper Moody's business practices addressed above.

The consequences of these failures are now manifest. Moody's has been severely harmed by its directors' and senior officers' reckless mismanagement and breaches of fiduciary duties owed to the Company and its shareholders described above. It remains subject to extensive regulatory and law enforcement investigations at the Federal and state level. It has been sued for billions of dollar of damages by purchasers of the Company's securities. It further faces massive potential liability to those market participants who relied upon its ratings of thousands of securities.

The Company itself has, as a direct result of the oversight failures, mismanagement and breaches of fiduciary duties described above, lost at least two-thirds of its value: Moody's stock fell from a high trading price of $76.09 on February 8, 2007 to a close of $30.00 on October 3, 2008 (just before the beginning of the general stock market collapse), a loss of $12.6 billion in market capitalization (based on shares outstanding in May 2007).

Finally, prior to the public revelations of such wrongdoing, which was at all times known to senior management and the Board (or which should have been known to the directors absent the reckless disregard of their oversight duties), management and the Board caused the Company to purchase billions of dollars in Moody's stock at inflated prices ($1.1 billion in 2006 and $943 million in the first half of 2007), while senior management was able to sell millions in personal Moody's stock holdings at those same inflated prices. Thus it appears that a scheme was perpetrated with the purpose and effect of enriching management and the Board and defrauding Moody's to purchase at least $2 billion in shares at artificially inflated prices.

Based on these events, it is clear that management and each member of the Board breached their respective and collective fiduciary duties of loyalty, candor and good faith in connection with their management, operation and oversight of Moody's business activities relating to ratings for  mortgage-related securities, and  breached their individual and collective fiduciary duty of good faith to establish, maintain, monitor and oversee the operation of adequate systems of internal information, reporting and controls.   Accordingly, on behalf of our client, we hereby demand that the Board take remedial action as follows:

1. Take  appropriate  disciplinary  action,  up  to  and  including suspension and/or recovery of incentive compensation, and termination for cause, of the persons responsible for perpetration of the wrongdoing and/or failure to detect and prevent it.

2. Cause the Company to commence legal action for breach of fiduciary duty against the persons responsible for perpetration of the wrongdoing described herein and/or failure to detect and prevent it (including, without limitation, Mr. McDaniel, Mr. Clarkson, Mr. Witt, and each person who has served as a member of the Board since 2000), for the purpose of recovering monetary damages for the benefit of the Company.

3. Cause the Company to commence legal action for securities fraud against the persons responsible for defrauding the Company and causing it to purchase over $2 billion in Moody's shares at artificially inflated prices (including, without limitation, Mr. McDaniel, Mr. Clarkson, Mr. Witt, and each person who has served as a member of the Board since 2005), for the purpose of recovering monetary damages for the benefit of the Company.

4.  Undertake a comprehensive review and overhaul of the Company's corporate governance and compliance practices and systems of internal control and operational and financial risk management for the purpose

not only of preventing recurrence of the failures detailed above, but to optimize them in light of current relevant best practices.

In making the demands set forth above, we do not concede that any of you is disinterested or otherwise capable of acting objectively in dealing with the demands in the Company's best interests. Indeed, your own culpability precludes such objectivity.

This letter is being sent so that in the event that derivative litigation on behalf of Moody's shall be necessary, the Company will have been given the first opportunity to commence the demanded litigation itself.

Notwithstanding the foregoing, we stand ready to be of assistance to Moody's in the pursuit of these claims.

Absent prompt action by the Company to obtain a recovery of its damages and to prevent further damages, we intend to pursue legal redress on behalf of our client and the Company.

Sincerely yours,


Richard D. Greenfield

Karen L. Morris
Morris and Morris LLC
Counselors at Law
(302) 426-0400
kmorris@morrisandmorrislaw.com

CC: Mr. William Sokolowski


Enclosure

RDG:gw